IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Arlington Division

| | | |
|---|---|---|
| XXXXXX by and through her Parents, | : | |
| JEFFREY AND SHARON SMITH, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 20-817 |
| | : | |
| THE SCHOOL BOARD FOR THE CITY OF | : | |
| ARLINGTON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT

### I. Preliminary Statement

1. This action is brought by XXXXXX Smith ("XXXXXX") and his family (collectively, "Plaintiffs" or "Parents"), a 12-year-old, rising sixth-grade student who has been diagnosed with Autism Spectrum Disorder ("Autism"), Attention Deficit Hyperactivity Disorder - Inattentive Type ("ADHD"), Other Specified Neurodevelopmental Disorder with Visual Motor Integration Deficits, and Specific Learning Disorders (deficits in reading, reading comprehension, and written expression. He is an eligible student with a disability under the categories of Specific Learning Disability ("SLD"), Other Health Impairment ("OHI"), and Autism, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1412, *et seq*., and is a Protected Handicapped Student under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. § 794.

2. This action is an appeal of the Hearing Officer decision in the Special Education Due

Process Hearing for XXXXXX brought under the IDEA, Section 504 and the Regulations governing Special Education Programs for Children with Disabilities in Virginia, 8 V.A.C. § 20-81-10 *et. seq.*

## II.   Parties

3.   XXXXXX has at all relevant times been a resident of Arlington, Virginia.

4.   Jeffrey and Sharon are XXXXXX's parents and at all relevant times have been residents of Arlington, Virginia.

5.   Defendant School Board for the City of Arlington, on behalf of Arlington Public Schools ("Defendant" or "APS") is located at 2110 Washington Blvd., Arlington VA 22204. On information and belief, APS is the recipient of several sources of federal funds and is a Local Educational Agency ("LEA") designated by Virginia law and the Virginia Department of Education ("VDOE") for the provision of educational services to individuals residing therein.

## III.   Jurisdiction and Venue

6.   This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA and Section 504.

7.   Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process Hearing, and are an aggrieved party under 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1391.

8.   All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Virginia. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV.   Facts

1. R.S. is a 12-year-old rising sixth grader currently attending The Newton School ("The Newton School"), a private school in Sterling, VA and whose home school is Nottingham Elementary school in APS. R.S. has the following diagnoses:

1. Autism Spectrum Disorder ("Autism");
2. Attention Deficit Hyperactivity Disorder ("ADHD"), Inattentive Type;
3. Other Specified Neurodevelopmental Disorder with Visual Motor Integration Deficits;
4. Specific Learning Disorder with Impairment in Reading and Reading Comprehension (Dyslexia), and;
5. Specific Learning Disorder with Impairment in Written Expression. (P Ex. 7)

2. R.S. began to show issues in school as early as late kindergarten and first grade. Due to him being significantly behind his peers in a variety of academic areas, he was tested for special education eligibility in the beginning of 1st grade at Nottingham Elementary School ("Nottingham") in APS. (P Ex. 44)

3. Prior to R.S.'s eligibility, APS conducted a psychological assessment of him in October 2015. (P. Ex. 44). In this evaluation, R.S. presented with difficulty in a number of different areas. These include: academic deficits in reading, writing, and math, inconsistent focus, attention, fine motor skill development, visual spatial skills, working memory, processing speed, rapid symbolic naming, naming speed, executive functioning skills, and social skills. (Id. at 010). The evaluator specifically notes that, "[R.S.]'s teachers observe an elevated/at-risk number of aggressive or defiant behaviors, atypical behaviors; and difficulties associated with maintaining

positive relationships with peers." She continues that R.S. "has poor social skills and he is occasionally unaccepted by the group and occasionally has trouble keeping friends." (Id. at 09). In her summary, she stated that "these behaviors should continue to be monitored." (Id. at 010).

4. Following the testing, R.S. was found eligible for an Independent Educational Plan ("IEP") under the category of Specific Learning Disability ("SLD"). (APS Ex.9). R.S. continued to receive special educational support at Nottingham from the 1st through the 4th grade. During this time period, R.S. exhibited issues not only in his academics, but presented with significant concerns related to his peer to peer interactions, executive functioning skills, and social skill development.

5. As a result of these concerns, R.S.'s teachers from 1st through 4th grade required him to carry around a "behavior contract" in a manila envelope upon which he would mark down and self-reflect on his behaviors and issues. (Garratt Test. pgs. 829-831 ¶¶5-22);(APS Ex. 6 pg. 001). During a classroom observation, it was noted that Bobby required re-direction seven times. (APS Ex. 7 pg. 001). In addition to the "behavior contract, R.S. also participated in a social skills group[1]. (Zipfel Test. pg.513-514 ¶¶14-7)

6. Prior to the November 6th re-evaluation of R.S. IEP eligibility, R.S.'s teachers, Mrs. Zipfel and Mrs. Garratt, completed a teacher narrative. (APS Ex. 22). In the narrative, both teachers identified numerous areas of weakness for R.S., including executive functioning issues, transition of his materials, and academic concerns related to his need for slower pace of instruction and inability to appropriately show mastery verbally or through writing. (Id. at 022-002). Notably, both of R.S.'s teachers also identified a number of areas related to peer

---

[1] It should be noted that, while it is not in dispute that R.S. was placed in a social skills group at Nottingham in at least the fourth grade, Ms. Zipfel's testimony stated that it was Ms. Garratt that placed him the group and Ms. Garratt's testimony was that she does not remember doing so. (Zipfel Test. pg.513-514 ¶¶14-7)

interactions and poor social skills development. (Id. at 022-001). They specifically state that R.S. had difficulty maintaining friendships, cut in line, interrupted staff and peers during conversations, purposefully made noises or interrupted during classroom activities or games, and would show behaviors that were "not appropriate for his age." (Id.).

7. On November 6, 2018, a Local Screening Committee ("LSC") met to reevaluate R.S. for IEP eligibility. Prior to the meeting, the Parents presented similar concerns to the school related to R.S. social and academic weaknesses. (S. Smith Test. pg. 325 ¶¶7-17);(P Ex. 022-004). During the meeting, the IEP team reviewed R.S.'s IEP progress reports, the teacher narrative provided by R.S.'s teachers, a classroom observation, and the 2014/2015 testing from R.S.'s initial eligibility. (APS Ex. 23-004-005). During the reviewed observation, R.S. appeared to require more support than his classmates, presented with a "messy" desk, and did not initiate with peers.

8. When asked by the parents whether or not additional evaluations would be beneficial prior to finding his eligibility, the school team members of the IEP told the parents: 1.) That it wasn't necessary to evaluate to find him continually eligible under his current category of SLP; 2.) That they had no reason to suspect any additional areas of eligibility, and; 3.) That R.S. had been making appropriate progress. They made this determination in spite of R.S.'s well documented behavior concerns, peer interactions difficulties, continued reading deficits, and organizational concerns. In fact, the school team members affirmatively ruled out the possibility of R.S. having either ADHD or Dyslexia without conducting any additional evaluations. (P. Ex. 38-002). Ultimately, it was determined by the APS members of the IEP team not to recommend additional testing. They stated, "On the basis of the review of existing data and input from the student's parents, the team determined that parent/guardian was informed of the reasons for the

team's decision not to collect additional data." (APS Ex. 23 pg. 004). R.S. was found continually eligible under only the category of SLD (Id. at 23 pgs.005-006).

9. On December 4, 2017, The Parents emailed R.S.'s teacher to inquire again, following the most recent eligibility, whether additional testing was needed. (P Ex. 22 pg. 004). In it, the Parent's state that they are "very curious why re-testing may not be desired and was wondering if you could provide some color. Dr. Jacobs [R.S.'s vision therapist] seemed to think testing every three years was very helpful." (Id.) Following Parent's email, they had a phone conversation with Ms. Garratt in which she reiterated APS's determination not to conduct testing and stated many reasons as to why the school did not recommend it. (P. Ex. 22 pg. 003). Ms. Garratt told the Parents that R.S.'s current file included enough information to likely find him eligible under the category of SLD, that any additional testing would not reveal any information they did not already have, and that the testing would remove R.S. from necessary class time. (Id.). At this time, Ms. Garratt did not express any concern to the Parents that there may be additional areas of eligibility for R.S.

10. An IEP meeting was held for R.S. on December 06, 2017. During this meeting, the IEP team identified needs in the areas of Attention and Organizational Skills, Math, Fine Motor Skills, Reading, Social-Emotional Functioning, Spelling, and Writing. The IEP included one goal related to Fine Motor Skills, one goal related to Attention/Organization, one goal in the area of Reading Decoding (Fluency), one goal in the area of Reading Comprehension, one goal in Writing, one goal on Spelling, one in Math Reasoning, and one goal for Social Emotional Functioning. Additionally, the December 2017 IEP included a total of 18 hours of direct and related services. This included 17 total hours of direct services in the areas of Reading, Writing, Social/Emotional, Mathematics, and Organization, and 1 hour of related services for Occupational Therapy. (P Ex.

12).

11. During the December 2017 IEP, the Parents once again inquired as to the whether updated testing would be necessary. The APS members of the IEP team reiterated that Ms. Garratt's earlier opinions and stated that, despite the previous testing being from 2015 when R.S. was seven years old, updated testing would not be beneficial for R.S.. Again, no APS staff members expressed any concerns that R.S. may have additional areas of eligibility. In particular, there was no discussion or concerns related to R.S.'s growing social skills deficits, concerns with executive functioning, or disruptive behaviors. (Id.).

12. Concerned about R.S. falling behind, the Parents were required to provide support to R.S. outside of Nottingham. The Parents provided him with after-school math and reading at a Kumon Learning Center for approximately two hours a day year round. The Parents also provided R.S. with vision therapy at their own expense during this time. However, despite the additional resources provided outside of the school environment by the Parents, R.S. still continued to struggle greatly throughout his fourth grade year at Nottingham. (S. Smith Test. pg. 337 ¶¶19-9).

13. Following the December 2017 IEP meeting, R.S.'s academics continued to decline. R.S. failed his math SOL, as well as performed poorly in his core academic classes. His scores on both standardized and in-class assessments continued to drop alongside the development of increasing social deficits. R.S.'s teachers and Parents reported that he found it difficult to socialize in class and, although he had a few friends, he found it difficult to keep them. (APS Ex. 22). During this time, the Parents made it known to the school that they were seeking potential alternate placements for R.S.. As early as December 4, 2017, the Parents emailed the school to notify them that R.S. was shadowing a student in another school to find

placement for his fifth grade year. (P. Ex. 45 pg.008).

14. On January 22, 2018, The Parent received an email from Kristine Carr ("Ms. Carr"), former special education director at St. Agnes, after Ms. Carr reviewed R.S.'s IEP. Ms. Carr stated that S. Agnes would not be able to "match or come close to" the 17 hours of IEP support provided in the IEP. (APS Ex. 26 pgs.001-002). In response, that Parent stated that, "The Smaller groups [R.S.] is in during the day are not very small right now. He is not getting individual attention in the school he goes to now. Knowing that, is there a way you could work with us?" (Id.)

15. That same day, the Parent emailed both Ms. Garratt and Ms. Zipfel about whether or not R.S.'s special educational needs could be met in a catholic school. In particular, the Parent stated that, "The one Catholic school that we looked into had a question about the IEP. It says he gets 17 hrs a wk? They cannot match that but if we got him an ot and a tutor at home plus more, could we make this work?" (P. Ex. 45 pg. 008). Neither Ms. Zipfel nor Ms. Garratt expressed any reservations about the supports R.S. would be receiving in the Catholic School. (J. Smith Test. pg.425 ¶¶5-10); (Zipfel Test. pg. 529-530 ¶¶17-1).

16. On January 26, 2018 the Parent once again emailed Ms. Garratt with concern over the lack of additional testing and whether R.S. presented with deficits related to ADD or Dyslexia. (P. Ex. 45 pgs.001-002). Ms. Garratt again responded that the LSC "ruled out" ADD/ADHD at the eligibility in early December 2017 and that, because R.S.'s testing from 2015 did not show deficits in his phonological processing, that it was her opinion he did not have it. (Id.)

17. In early February 2018, the Parents observed R.S. in both his pull-out reading and OT service hours. During their observation, the Parent noted that R.S. was not receiving the kind of individualized attention and support they had believed. (J Smith Test. pg.429 ¶¶13-19). Rather,

the Parent became concerned because it did not appear like the reading interventions were organized and the OT work was no different than what the Parents were doing with him at home. (Id. pgs. 431-434). The Parents were also concerned by R.S.'s lack of social skill development. The Parents stated that they would often find him sitting alone on the bench of the playground and he did not appear to have close friends. (J Smith Test. pg.430¶¶1-13).

18. Towards the end of the 2017-2018 school year, and despite APS's insistence that R.S. was making appropriate progress, his grades and classroom performance dropped. (APS Ex. 19 pg. 002). From the 3rd to the 4th quarter, R.S.'s grades dropped in both Math and Social Studies. (Id.). His teachers noted that "he did not perform as well on the assessments as he had in previous quarters. (Id.).

19. An IEP addendum was held on meeting was held on May 2nd, 2018. However, despite the Parents continuing concerns, the May 2018 addendum made no changes to goals, strengths/needs, services, or proposed placement from the December 2017 IEP. However, it was also understood by the APS staff at the time of IEP development that R.S. would be attending St. Agnes in the fall instead of Nottingham. (Zipfel Test. pg. 529 ¶¶1-16). The Parents did however sign the IEP in agreement with the understanding that R.S. would likely not be attending APS in the fall. (Id.).

20. Following the 2017-2018 school year, and determining that R.S. was not making sufficient progress at APS, the Parents chose to unilaterally place R.S. at St. Agnes Catholic School ("St. Agnes") for the 2018-2019 school year. Almost immediately, the staff at St. Agnes told the Parents that R.S. was showing issues at school beyond what was identified by APS. For this reason, R.S. had a difficult transition to St. Agnes. The staff at St. Agnes stated that R.S. was presenting with deficits in organization, grade level math and writing, and socialization. Of note,

the St. Agnus staff identified R.S. as showing many deficits in social communication. They stated that he was having difficulty with missed social cues, misinterpreted others, and had a biased perception of reality. Due to many conflicts arising between R.S. and his peers, St. Agnes required R.S. join a social skills group outside of school to help with these skills. (Reid Test. pg.90 ¶6-pg.91 ¶7).

21. However, despite their efforts, St. Agnes staff realized R.S. was not progressing to the extent that other students with SLDs in their program had been. Due to this, and his growing list of social deficits, the staff at St. Agnes urged the Parents to have R.S. privately evaluated for additional disabilities. (Id.);(Reid. Test pg.93 ¶¶9-17).

22. Following their own concerns and those of St. Agnes staff, the Parents decided to have R.S. privately evaluated by Family First Psychological Services ("Family First") over three testing dates (February 15, February 19, and March 8) from February to March 2019. (P Ex. 7). According to the testing conducted by Family First, R.S. predictably scored in the deficient to borderline range on standardized measures for reading fluency and written expression. He also showed significant deficits in working memory (9th percentile for picture span) and processing speed (1st percentile). (P Ex. 7 pgs. 028-031). However, in addition to R.S.'s previously acknowledged deficits in areas of SLD, the Family First testing also identified significant concerns in the areas of attention, behavioral regulation, emotional regulation, and social skills. Of note, the Teacher rating scales showed that R.S. was experiencing far more difficulty with behavioral and emotional regulation in the school environment than the Parents were even seeing at home. (Id. at 033-039).

23. As a result of their evaluation, the Dr. Kelly Theis ("Dr. Theis") of Family First determined that R.S. met the criteria for diagnoses of: Autism Spectrum Disorder, Other

Specified Neurodevelopmental Disorder with Visual Motor Integration Deficits, Attention

Deficit Hyperactivity Disorder - Inattentive type, SLD in the area of reading (Dyslexia), and

SLD in the area of written expression. (Id at 020-022).

24. In addition to identifying R.S. with several new disabilities, Dr. Theis also made

recommendations regarding what academic programming and support will be necessary for R.S.

to make appropriate progress. In particular, Dr. Theis recommended accommodations related to

permitting R.S. alternative means of responding to assessments, additional time, breaking down

of assessments, alternative seating, frequent redirection, oral presentation of assessments, and

others. Additionally, Dr. Theis states that, due to his deficits in the areas of pragmatic language

and phonological processing, R.S. would require goals and services in the areas of

Speech/Language to support this development. Lastly, Dr. Theis states that R.S. would function

best in an environment with "a small student-to-teacher-ratio, environmental structure, multi-

modal instruction, and frequent reinforcement." (Id. at 022-027).

25. On May 8th, 2019, the Parents received an email from Ann Reid ("Ms. Reid"), assistant

principal at St. Agnes detailing an incident in which R.S. was inappropriately engaging with

peers that escalated into a physical altercation where he jumped on a student's back, stabbed a

female classmate with a plastic fork, and broke a student's bracelet while trying to engage with

them. (P Ex. 45-001). During her testimony, Ms. Reid stated that incidents similar, "though not

quite as intense," as those on May 8th, 2019, occurred somewhat frequently for R.S. as a student

at St. Agnes. (Reid Test. pg.95 ¶¶3-15). She stated, "He just would perseverate with certain

students. 'Well, this person is my friend so I need to spend time with this person,' and despite

what the other classmate was saying, like, 'I don't want to spend time with you right now.'" (Id. at

pg.96 ¶¶2-7). She also testified that R.S. presented with issue related to perseverating on specific

details and whether or not he was chosen for specific things. (Id. at pg.96 ¶16-18). She testified

that, "He also would feel slighted if he wasn't chosen for something. So that would be...You

know, if a teacher chose someone else to be the group leader or something, he would get very

upset, and that could set something off." (Id.).

26. During his time at St. Agnes, Ms. Reid testified that R.S. would also often be the target

for bullying by some of the students. (Reid Test. pg. 144 ¶¶7-20; pg.157 ¶¶1-20). When asked,

she testified that R.S.'s lack of social skills made him a target for peer harassment. (Id.). She said,

"Unfortunately, Bobby is not just always just sitting by idly. I mean, Bobby did not know how to

start conversations, Bobby did not know how to continue conversations. Bobby did invade

personal space. Bobby felt that he was everyone's best friend and felt that they should be best

friends with him and could not fathom that they were not best friends with him." (Id.).

27. Following the Family First testing and the difficulties R.S. was showing in school, the

Parents contacted APS to notify them of R.S.'s updated diagnoses and express their concerns

over APS failure to conduct additional testing and provide support to R.S. In particular, the

Parents expressed concern over the delayed nature of R.S.'s identification and how that may have

caused him to fall further behind in a number of deficit areas as well as created significant stress

in their household. (P. Ex 21-002).

28. On May 24, 2019, the Parents sent an email to Ms. Heather Rothenbuescher, Special

education supervisor for APS, stating their concerns and their intent to privately place R.S. at

public expense. (P. Ex. 21)

29. On May 30, 2019, Ms. Reid sent a letter to APS on behalf of the Parents further outlining

their concerns with R.S.'s proposed IEP and the IEP process. In her letter she states that, given

her decade of experience as a public school special education instructor, she believed APS failed

to develop an appropriate IEP for R.S. and denied him FAPE by refusing to update his testing from his initial eligibility in 2015. In particular, she noted that, despite APS assuring the Parents his progress was adequate, R.S.'s goals were largely carried over year to year. Additionally, she correctly stated that R.S.'s own IEP and educational records suggested that he had deficits beyond the SLD identified when he was seven and that, even without such records, it is common practice to re-test young children as their needs develop over time with their cognitive development. (P Ex. 20; Reid Test. pgs. 137 ¶¶7-21). The Parents received no direct response from APS following Ms. Reid's letter.

30. Instead the Parents received notice from Carlette Bryan ("Ms. Bryan"), APS Special Education Coordinator, on June 13, 2019 that an LSC meeting would be held for R.S. on the following Monday, June 17, 2019. (APS. Ex. 36; P Ex. 16). In response to Ms. Bryan's email, the Parents responded that same day stating that they had already found and reserved educational placement for R.S. at the Newton School ("The Newton School") in Sterling, Virginia. (P Ex. 21).

31. The Parents, accompanied by Ms. Reid, met with APS on June 17, 2019. During this meeting, the Parents expressed their concerns over the denial of FAPE by APS and requested that the school division place R.S. at The Newton School through his IEP. The APS members of the IEP team gave the Parent's the impression that they were open to the idea but that they would need to reengage in the eligibility process and conduct their own testing prior to privately placing R.S. At the meeting, the Parents provided consent for APS to receive information from St. Agnes, as well as complete: an educational, hearing and vision screening, occupational therapy, sociocultural, observation, teacher narrative, psychological, and speech/language ("Sp/L") evaluations. (APS Ex. 37-002-003);(P Ex. 30b).

34. APS conducted their psychological testing on August 2, 2019. (P Ex. 9). APS testing showed that R.S. scored very poorly on measures involving attention, planning, phonemic isolation, symbolic naming, and reading efficiency. Ultimately, the APS evaluator stated that, "R.S.'s performance on current testing is highly consistent with findings as reported by outside private psychological testing." (Id. at 005).

35. APS conducted their Speech/Language testing on August 2, 2019 as well. (P Ex. 8). Similar to the testing conducted by Dr. Theis, APS's Sp/L evaluation revealed a number of areas of concern related to R.S.'s conversational and social communication skills. In particular, R.S. scored below the average range as compared to same age peers on measures involving making inferences, interpersonal negotiations, and multiple interpretations. (Id. at 006). The evaluator made no specific recommendations for programming, however, they did note that:

> R.S.'s deficits in social pragmatic language, specifically inferring what people might be thinking as well as generating appropriate solutions to conflict, may negatively impact his ability to negotiate conflicts with peers effectively and well as accurately interpret the body language/visual cues generated by his peers. He may have difficulty maintaining friendships long term. R.S.'s underdeveloped narrative skills may negatively impact his ability to generate cohesive and organized verbal information in order to explain concepts or provide information about social events. (Id.)

36. In addition to the testing conducted by APS, they also received report cards and other information from St. Agnes regarding R.S. and his current level of functioning. (P Ex. 15);(APS Ex. 40). Included in this information was a teacher narrative submitted by Amada Fallon ("Ms Fallon"), R.S.'s resource teacher at St. Agnes. (APS Ex. 40). In her narrative, Ms. Fallon identified deficit areas for R.S., to include issues related to pragmatic language, social interactions, peer relations, rigid thinking, and lack of self-advocacy. (Id.). She also stated that, while math was a relative strength for R.S., he presented with academic deficits in the areas of written expression, oral expression, comprehension skills, organizational skills, and memory. (Id.

at 002).

37. Although the Parents provided consent to both a sociocultural and educational evaluation on June 17, 2019, it does not appear as either was ever completed, as it was not provided to the parents and is not included in the record.

38. An eligibility evaluation was then held for R.S. on August 7, 2019 where he was found eligible for Special Education support under the categories of SLD, Autism, and Other Health Impairment. (P Ex. 17; 30a). During the eligibility meeting, the team reviewed the results of APS's own testing, however, the team did not have the information previously provided by St. Agnes, Ms. Reid's letter from May 30, 2019, or Dr. Theis's evaluation available for review. Ms. Reid and the Parents had to share their information with the team during the meeting. (Reid Test pgs. 147-148 ¶¶21-7). Included in the discussion and the documentation, were all of the issues listed above regarding R.S.'s perseveration, social skills, pragmatic language, organization skills, and rigid thinking. (APS Ex. 43-002). The SEC committee decision states

> [R.S.] had difficulty with social interactions and making new friends. He perseverates and will sharpen pencil to the base. He has difficulty expressing his response to questions that he knows he has the answer to. His organization skills are very low, which is difficult for him to turn in assignments. "I don't know" is what he often says. He also tends to have one solution to solving things. Id.

39. During the course of the meeting, the Parents shared their intent to place R.S. at Newton. (P. Ex. 30a). They were asked by the school team members why they were choosing The Newton School, to which the Parent responded that they were encouraged by the small classroom environment and the focus on social skill development. (Id.). Toward the tail of the meeting, Colleen Koval, the LEA Representative, made a point to state that APS would ensure that both a school psychologist and a speech language pathologist would be present to discuss appropriate supports for R.S. at the IEP meeting following the new eligibility determination. (P Ex. 30a).

40. On August 26, 2019, the Parents were notified of the school's attempt to schedule an IEP meeting for August 28, 2019. Concerned by the short timeframe provided by the school, the Parents agreed, under protest, to allow the meeting to progress despite the fact that R.S.'s father could not be present for it. (J. Smith Test. pgs. 447-449).

41. An IEP meeting was held on August 28, 2019. (APS. Ex. 45); (P Ex. 30c). This meeting was attended by the Mother and Ms. Reid, but not the Father. Of note, the only APS members to attend both the initial eligibility, and the IEP meeting was the LEA representative, Ms. Koval. As well, neither a speech/language pathologist nor a school psychologist were present for the August 28, 2019 meeting despite Ms. Koval's statement that they would be. (Id.).

44. As the meeting began, it became apparent to both the Parent and Ms. Reid that the IEP team members were not prepared. Ms. Reid testified that she was not made to feel "welcome" by the APS members of the IEP team. (Reid Test. pgs. 147-148 ¶¶21-7). During the course of the IEP meeting, the team did briefly review the present levels, goals, services and accommodations. (P Ex. 30c);(Reid. Test pg. 103-108). However, at no point did any member of the IEP team actually review either APS's own evaluations, Dr. Theis' evaluation, or the data provided by St. Agnes. (P Ex. 30c);(Zipfel Test. pgs. 547-550). In fact, other than the section labelled "Motor Functioning," no changes were made to the present levels of performance from the December 2017 IEP to reflect the additional data provide by subsequent private evaluations, teacher narratives, report cards, school evaluations, and other gathered data. Of note, no information related to speech, written expression, reading comprehension, social skills/pragmatic language, or even mathematics was updated. (Id.).

45. The team then read each of the goals and discussed the appropriateness of using "motivation" as a criteria for the pre-score data of the Motor functioning goal. (APS Ex. 45-

011)(P Ex. 30c). All of the goals presented the goals were originally written in December 2017. (APS Ex. 45 pgs. 011-013);(P Ex. 12 pgs. 008-011). In fact, rather than change the goals themselves, the IEP team appeared to update the "pre-score" dates for the IEP to August 20, 2019 to suggest the data the goal was based data on was recently obtained. (Id.). Again, at no point was any updated data presented or discussed at the IEP meeting on August 28, 2019. (Zipfel Test. pgs. 551-554 ¶¶8-15). Ms. Reid also expressed some concern during the IEP meeting that the goals represented areas R.S. had already mastered. (P Ex. 30c);(Doll Test. pgs. 651-652). The goals themselves were also not written in a way that provided appropriate means to measure mastery. (Livelli Test. pgs. 269-275 ¶¶15-9).

46. Of particular concern was the lack of any goals related to pragmatic language development or social skills. R.S.'s sole goal in the area of social skill development, also from 2017, states "Bobby will participate appropriately with peers in group activities by following the rules of the activity and using materials as meant to be used with no more than 1 teacher prompt." (APS Ex. 45 pg. 014). Once again, there was no review or discussion of the testing prior to this determination.

47. The team then reviewed the accommodations provided in the IEP. During this review, the team proposed and added many of the accommodations suggested in Dr. Theis's evaluation. (P. Ex. 7 pgs. 022-027). However, they did not include any accommodations related to alternative means of response that this time. (Id.) Additionally, the proposed IEP failed to include even a discussion of services related to speech language development or pragmatic language. Without a speech/language pathologist present at the meeting, the team neither reviewed nor referenced the APS speech/language evaluation. (APS Ex. 45 pgs. 015-016).

48. Finally, prior to this IEP meeting, the Parents were led to believe by APS staff that R.S.

would be privately placed during this meeting. (J Smith Test. pg. 449 ¶¶10-18). Instead, APS

proposed that R.S. remain at his neighborhood school of Williamsburg Middle School. (APS Ex.

45 pg. 019). When the parent tried to ask for placement at the Newton School, the team informed

her that they could not make that determination at this time and would like to observe R.S. at the

Newton School. (P Ex. 30c). The parent provided their consent to permit APS to observe R.S.

49. Concerned by both the inappropriate nature of the proposed general education setting and

the lack of substantive difference from the 2017 IEP, the Parents rejected APS's August 2019 IEP

proposal.

50. Following the IEP meeting on August 28, 2019, the Parents contacted APS to express

their displeasure at the lack of transparency during the IEP process. (P Ex. 24).

51. On September 17, 2019, R.S. was observed at The Newton School by Kelly Krug ("Mrs.

Krug"), APS Assistive Technology Student Services supervisor. (P Ex. 11). Mrs. Krug's

evaluation noted that R.S. was showing no issue attending to instruction, responding to teacher

prompts, and staying on task in his small classroom environment. (P Ex. 11 pgs. 001-003).

52. Following the Parent's email, they were contacted by APS regarding holding another IEP

meeting on September 23, 2019 to hold another IEP regarding R.S.'s placement. (P Ex.25).

53. On October 2, 2019, R.S. was observed at The Newton School by Sharon Sterling ("Ms.

Sterling"), APS OT coordinator. (P Ex. 11 pg. 004). Ms. Sterling identified that R.S. required

significant 1:1 redirection in the classroom but that the environment seemed well organized and

conducive to learning. She noted that he had difficulty with reading and writing and some fine

motor skills. She also stated that he did not interact with peers during the reading and writing

segment of the class but that he engaged more fully when the class played a Jeopardy game. (Id.)

54. Following their observations of R.S. at Newton, the IEP team met on October 7, 2019.

(APS Ex. 50) During this meeting, the APS members of the IEP team discussed their observations and stated that The Newton School was not an appropriate placement for R.S. due to their lack of special education trained teachers and lack of supports such as multi-modal instruction (P Ex. 30d);(P Ex. 11). However, the APS observers did observe that R.S. was appropriately interacting academically in the classroom, albeit with direct teacher support. (Id.)

55. Following their discussion of the observations, the IEP team discussed the Parent's concerns related to Newton. (P Ex. 30d). During this discussion, the Parent's stated that, per the recommendation of Dr. Theis and others, that R.S. required a small classroom environment to best access his educational environment. (Id.). The team then briefly discussed whether R.S. would benefit from a small class size in middle school. (P Ex. 30d). Of note, one APS member of the IEP team, Kelly Krug ("Ms. Krug"), stated that due to her suspicion that R.S. was likely "at least two grade levels behind" in reading, it would be appropriate for him to be placed in a self-contained reading course. According to documentation from as far back as 2017, R.S. has never been more than a few months behind on his reading progress. (P Exs. 7, 9, 10, 14, 22). However, other members of the IEP team expressed some concern as to whether this would be appropriate. (P Ex. 30d). Ultimately, the APS members of the IEP team proposed Williamsburg Middle School as R.S.'s placement. (APS Ex. 50 pg. 018).

56. At the conclusion of the meeting, and unknown to the Parents, APS proposed changing R.S.'s service hours to reflect time in the self-contained setting for both Reading and Writing as well as increase in social/emotional service hours from 1 hour to 3.75 hours per week in the general education setting. (Id. at 014). APS also added the following three accommodations to the IEP without significant discussion: access to slant board, access to speech to text, and access to keyboard. (Id.).

57. At the conclusion of the meeting the parents were not provided a copy of the newly proposed IEP. (J. Smith Test. pg. 459 ¶¶20-22);(Doll Test. pg. 663 ¶¶13-16).

58. Following the meeting, the parents did receive a copy of the Prior Written Notice ("PWN") in the mail for the October 2019 IEP meeting. (P Ex. 19). This letter did not include a copy of the proposed IEP. The Prior Written Notice also failed to specifically identify any changes to the IEP made at the meeting. (Id.). The PWN stated that,

> The IEP team reached consensus to increase services in self-contained academics on the proposed APS IEP to assist Bobby with focus, attention and to limit distractions. The team also reached consensus for accommodations to support Bobby's writing, legibility and ability to get his ideas on paper without having to write (e.g., voice to text). At the conclusion of the meeting, both parents verbally rejected the proposed APS IEP. (P Ex. 19 pg. 002).

59. Out of other options, the Parents filed due process against APS on November 12, 2019.

60. On February 25, 2020, Dr. Theis conducted an updated Kaufman Test of Academic Achievement ("KTEA") on R.S. (P Ex. 10). This test showed that R.S. was performing roughly at grade level in both reading and mathematics. (Id. at 005). However, the testing also revealed that R.S. continues to struggle significantly with writing, fluency, and decoding, where he is two to three grade levels behind on average. (Id.). When asked to explain what, if any significance these scores had with regard to the previous testing, Dr. Theis stated that he had made progress, particularly in the area of reading. However, she added the caveat that, due to the global and compacting nature of his deficits, he is going to require a lot more time to make significant progress in certain areas. She testified, "I think he is showing progress. I think it also slows us progress is going to be very slow for him. His deficits are pretty global, and…it's going to be slow to make progress." (Theis Test pg. 52 ¶¶3-9).

61. The Due Process was then properly held over three consecutive days from March 11,

2020 through March 13, 2020 without any delay.

62. The parties both delivered written closing briefs on April 10, 2020.

63. On April 20, 2020, the HO delivered his decision finding for APS. In his decision, the HO found for APS on all counts with the exception of awarding the Parent reimbursement for the costs of the Dr. Theis' evaluation. The entire decision consisted of roughly six pages in total, with less than two full pages devoted to the analysis of the only two issues considered by the HO.

64. In the Parent's closing brief, the issue of parental participation, goal appropriateness, and denial of speech services were argued in a total of almost ten pages. At no point in the HO's decision are any of the above three even mentioned.

## V. <u>Statutory Authority</u>

65. The purpose of the IDEA is to ensure that "all children with disabilities have available to them a Free and Appropriate Public Education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R. § 300.100 *et seq.*, and 8 V.A.C. 20-81-10 *et seq.*, require that Local Educational Agencies ("LEAs") like NPS provide disabled children a Free and Appropriate Public Education ("FAPE"), as well as establish extensive due process procedures to effectuate that right. The appropriateness of a special education student's education must be decided on a case-by-case basis, in light of the unique needs of each eligible student. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 553 IDELR 656 (U.S. 1982). According to the two- part *Rowley* test, a state must (1) comply with the procedures set forth in the IDEA, as well as (2) develop an IEP that is reasonably calculated to enable the child to receive educational benefits. *Id.* In addition, the U.S. Supreme Court held, in *Endrew F. v. Douglas County School District RE-1,* that in order to

meet the second prong of the two-part *Rowley* test, regarding a school district's substantive

obligation under the IDEA, ". . . a school must offer an IEP reasonably calculated to enable a

child to make progress appropriate in light of the child's circumstances." 2017 WL 1066260

(2017). The Court stated that ". . . the essential function of an IEP is to set out a plan for pursuing

academic and functional advancement." *Id.*

66. The IDEA and its regulations establish a comprehensive format by which a school

district must identify and evaluate all children with disabilities who may require Special

Education and Related Services. This is known as the "Child Find" obligation, and includes a

school district's responsibility to assess the child in all areas of suspected disability. 20 U.S.C. §

1412(a)(3); 34 C.F.R. § 300.111(c)(1). The LEA then must identify the child's area(s) of need,

determine the IDEA eligibility category, and develop and implement an appropriate IEP that

contains appropriate "educational instruction specially designed to meet the unique needs of the

handicapped child . . . supported by such services as are necessary to permit the child to benefit

from the instruction." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176 at 188-89

(1982). The IEP is developed by an IEP team consisting of LEA officials and the child's parents,

who may have knowledge or special expertise regarding the child. *Sch. Bd. of the City of Norfolk*

*v. Brown,* 769 F. Supp. 2d 928, 941-920 (E.D. Va. 2010); §1414(d)(1)(B).

67. The IDEA states that, when considering whether additional information is necessary in

the context of a "reevaluation" one must determine whether: 1.) Additional information is

necessary in order for the LSC to find the student continually eligible under their initial category

of eligibility; 2.) Whether a Parent specifically requests it, and; 3.) Whether the school has reason

to suspect that the student might qualify under an additional area of eligibility. 20 U.S.C. §

1414(a). However, in *Phyllene W. v. Huntsville Ct. Bd. Of Ed.*, the Eleventh Circuit held that a

school district was liable for failing to properly evaluate a student for an area of disability they

knew he had deficits in, despite the fact that the parent never specifically requested testing. The court stated, "While it is certainly true that Ms. W. did not request an evaluation of her daughter's hearing, the fact that she did not do so did not absolve the Board of its independent responsibility to evaluate a student suspected of a disability, regardless of whether the parent seeks an evaluation." See 20 U.S.C. § 1414(b)(3)(B). "Even where a parent is aware of a suspected disability, the Board is required to act. (citing Cf. Hellgate, 541 F.3d at 1209)" *Phyllene W. v. Huntsville Ct. Bd. Of Ed.*, 630 F. App'x 917, 925 (2015).

68. *34 C.F.R. 300.320 (a)(2)* states that an IEP must include "A statement of measurable annual goals, including academic and functional goals designed to: a. Meet the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum" and "b. Meet each of the child's other educational needs that result from the child's disability." In addition, courts have held that IEPs should be portable, or pass the "stranger test," meaning that an appropriately written IEP could be implemented and progress measured by someone unfamiliar with the student. *Mason Cty. Comm. Sch. Dist.,* 46 IDELR 148 (SEA IA 2006).

69. In Rowley, the Supreme Court also outlined the importance of parental participation in the IEP process. It stated, "Congress sought to protect individual children by providing for parental involvement in . . . the formulation of the child's individual educational program." *Rowley*, 458 U.S. at 208. In fact, in the IDEA, parents appear first on the list of required IEP team members. 34 C.F.R. 300.321(a)(1) (2007). In *Honig v. Doe*, the Supreme Court noted that the law provides for "meaningful parental participation" in all aspects of the child's educational placement. 484 U.S. 305, 324 (1988). Accordingly, the Fourth Circuit has emphasized that "special education laws require that extensive efforts be made to involve parents in IEP meetings and decisions." *DeVries by DeBlaay v. Spillane*, 853 F.2d 264, n.1 (4th Cir. 1988).

70. A school district must give a parent prior written notice a reasonable time before it proposes or refuses to change the educational placement of a child. 34 CFR § 300.503(a). In a decision held by an Independent Hearing Officer ("IHO") in Colorado, it was held that "The content of the notice was inadequate because it simply documented that a possible change in placement would be discussed at the upcoming IEP meeting rather than documenting the change of placement actually proposed." *Mesa Cnty. Sch. Dis. 51*, 68 IDELR 84 (2016).

71. In a case before the U.S. District Court of the District of Columbia, *Smith v. Theresa Squillacote, et al*, the court found that, "The purpose of the notice requirement is to ensure that parents receive sufficient information about where the agency proposes to place their child and why that placement was chosen, so that parents may reach an informed conclusion about whether the placement will provide an appropriate education." *Smith v. Theresa Squillacote, et al*, 800 F. Supp 993, 997 (1992). The court continues, "The information in the notice, along with the IEP, the MDT Report, and all other information the agency has provided to the parents, should enable them to decide whether to contest the placement. If the notice provides such information, then it is sufficient." Id. Lastly, in an OSEP guidance letter, *Letter to Chandler*, OSEP explained that, "Notice must be provided so that parents have enough time to fully consider the change and respond to the action before it is implemented." *Letter to Chandler*, 59 IDELR 110 (OSEP 2012). Included in this timeliness requirement is also, presumably, a requirement that the Parents are provided enough time to fully consider the proposed IEP before having a decision held against them.

72. Parental participation also requires that school districts obtain parental consent before changing any part of a student's IEP. Included in this is the fact that parents may choose to provide consent to only certain parts of a child's IEP. 8 VAC 20-81-170(E)(4)(d) (34 C.F.R. §

300.300(d)(3)) provides that a school division "may not use a parent's refusal to consent to one service or activity to deny the parent(s) or child any other service, benefit, or activity of the local educational agency . . ." Furthermore, the Virginia Department of Education ("VDOE") has stated that Virginia regulations clearly require school divisions to ensure that an IEP is implemented as soon as possible following parental consent. (8 VAC 20-81-110(B)(2)). While this regulation does not explicitly state that the school district must accept a partial agreement, when read in light of 34 C.F.R. § 300.300(d)(2) and (3) and 8 V.A.C. 20-81-170(E)(1)(d), it is clear that a school district should not construe parents' partial denial of an IEP as permission to deny the remainder of the IEP.

73. When parents disagree with the results of any testing conducted by a school district, they may request an IEE at public expense pursuant to 34 C.F.R 300.502. 34 C.F.R 300.502(b)(1) states, "A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." C.F.R 300.502(b)(2) continues, "If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either: (i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) Ensure that an independent educational evaluation is provided at public expense."

74. In some cases, a school district may request additional information from parents regarding the IEE. According to 34 C.F.R. 300. 502(b)(4), ". . . the local educational agency may ask for the reason for the parent's objection to the public evaluation." However, "the explanation by the parent(s) may not be required and the local educational agency may not unreasonably delay either providing the independent educational evaluation at public expense or initiating a due process hearing to defend the public evaluation." Id.

75. When a school district fails to provide FAPE under the IDEA, it is well-settled that compensatory education is an available remedy for the student. Compensatory education involves "discretionary, prospective, injunctive relief-crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." G. v. Fort Bragg Dependent Schs., 343 F.3d 295, 308-09 (4th Cir. 2003).

76. In School Committee of Burlington v. Department of Education of Massachusetts, the U.S.  Supreme Court determined that it is possible for an LEA to be responsible for the reimbursement of costs associated with unilateral private parental placement of a student with disabilities in cases where: (1) the school's IEP is found to be inappropriate, and (2) the private program is found to be appropriate under the IDEA. 471 U.S. 359, 369 (1985).

## VI. Issues

77. Pursuant to the above standards, the Hearing Officer incorrectly found that Parents did not meet their burden. As stated above, Parents assert that APS failed to provide XXXXXX a FAPE, as required under the IDEA, 20 U.S.C. § 1400 *et seq*. (2010), and Section 504, 29 U.S.C. § 701 *et seq*, since at least December 2017, by the following:

**A.) APS Committed Procedural Violations of the IDEA that Resulted in a Denial of FAPE to R.S. by: 1.) Failing to Properly Evaluate Him According for Additional Areas of Eligibility from December 2017-May 2019; 2.) Failing to Properly Review Evaluation Date in the Context of R.S.'s IEP meetings, and; 3.) Failing to Permit the Parents Reasonable Opportunity to Participate in the IEP Process Through Failure to Provide Parent with Relevant IEP Documentation and Appropriate PWNs.**

**I. APS Inappropriately, and in Violation of the Procedural Mandates of the IDEA, Failed to Conduct Necessary Evaluations on R.S. Despite Consistent Evidence that He May Have Qualified under Additional Areas of Eligibility.**

78. As stated above, the appropriateness of a special education student's education must be

decided on a case-by-case basis, in light of the unique needs of each eligible student. Bd. Of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 553 IDELR 656 (U.S. 1982). The first part of the Rowley test states that: the state must (1) comply with the procedures set forth in the IDEA. Id. The IDEA states that the Hearing Officer may find that the student was denied a FAPE for procedural inadequacies only if they: (1) impeded the student's right to a FAPE, (2) significantly impeded the parents' opportunity to participate in the decision-making process, or (3) deprived the student of a FAPE. 34 CFR 300.513; 8 VAC20-81-210(O)(17).

79. The IEP is the vehicle through which the IDEA provides a student the goals, accommodations, services, related services, placement, etc., that addresses a student's needs according to their disability and provides them a FAPE. 34 C.F.R. 300.112, 8 VAC 20-81-110. Before an appropriate IEP can be developed, the school district's evaluations must first identify all the areas of deficit that are impacting the student's access to education. The IDEA states that an evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not linked to the disability category in which the child has been identified." 34 C.F.R. 300.304(c)(4) and (6); 8 V.A.C. 20-81-70(C)(9) and (14). This applies to initial evaluations as well as reevaluations. Letter to Feehley, 211 IDELR 415 (OSEP 1986).

80. In this case, APS failed to properly identify all of R.S.'s areas of deficit by failing to conduct additional testing measures of R.S. despite repeated Parent inquiries and a consistent history of deficits wholly unrelated to his lone SLD eligibility. (P Exs. 12, 22, 38 pg. 002, 44);(APS Ex. 22). Since his initial eligibility in 2015, R.S. presented with deficits in behavior, organizational skills, social skills, and work completion. (Id.) In fact, in the first psychological evaluation conducted by APS in 2015, it was stated that, ""[R.S.]'s teachers observe an elevated/at-risk number of aggressive or defiant behaviors, atypical behaviors; and difficulties associated with maintaining positive relationships with peers." She continues that R.S. "has poor

social skills and he is occasionally unaccepted by the group and occasionally has trouble keeping friends." (P Ex. 44 at 009). These concerns only appeared to escalate as R.S. progressed through elementary school. For years, R.S. was required to carry around a behavior plan/chart from class to class. (APS Ex. 22). In fourth grade, concerned by his interactions with other students, R.S. was placed into a social skills group. (Id.) Meanwhile, nearly every single review of R.S.'s performance from middle school also referenced his deficits in the areas of organization and executive functioning. (Id.).

81. The IDEA states that, when considering whether additional information is necessary in the context of a "reevaluation" one must determine whether: 1.) Additional information is necessary in order for the LSC to find the student continually eligible under their initial category of eligibility; 2.) Whether a Parent specifically requests it, and; 3.) Whether the school has reason to suspect that the student might qualify under an additional area of eligibility. 20 U.S.C. § 1414(a). During their testimony, and in argument, APS made a specific point to state that the Parents did request updated evaluations at the December 2017 LSC meeting. This is true. However, in *Phyllene W. v. Huntsville Ct. Bd. Of Ed.*, the Eleventh Circuit held that a school district was liable for failing to properly evaluate a student for an area of disability they knew he had deficits in, despite the fact that the parent never specifically requested testing. The court stated, "While it is certainly true that Ms. W. did not request an evaluation of her daughter's hearing, the fact that she did not do so did not absolve the Board of its independent responsibility to evaluate a student suspected of a disability, regardless of whether the parent seeks an evaluation." See 20 U.S.C. § 1414(b)(3)(B). "Even where a parent is aware of a suspected disability, the Board is required to act. (*citing Cf. Hellgate, 541 F.3d at 1209*)" *Phyllene W. v. Huntsville Ct. Bd. Of Ed.* 630 F. App'x 917, 925 (2015).

82. This case, much like *Phyllene*, rests on the idea that APS was made well aware of the potential concerns related to R.S.'s areas of suspected disability and still chose not to evaluate him. As stated above, the record shows many instances where both the Parents and staff acknowledged concerns related to R.S.'s executive functioning skills and behaviors. (P Exs. 12, 22, 38 pg. 002, 44);(APS Ex. 22). During their testimony, APS witnesses attempted to state that R.S.'s use of a behavior charts, participation in social skills groups, and other similar issues present in their own narratives were not unusual for students with solely SLD. (Zipfel Test. pgs 538-539 ¶¶14-16). Additionally, one APS witness, Christine Zelenak ("Ms. Zelenak"), a school psychologist, also testified that, "I also just want to reiterate that it wouldn't have changed his programming even if we had looked at the ADHD piece.[2]" (Zelenak Test. pg. 576 ¶¶7-9). By this testimony, it appears that APS's position is that, even if they had failed procedurally to conduct evaluations, it did not have a substantive impact on R.S.'s receipt of a FAPE because the IEP programming would not have changed. However, the courts have already done away with this argument.

83. In *Harris v. District of Columbia*, The U.S. District Court for the District of Columbia held that the role of an evaluation "is to contribute to the development of a sound IEP." *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 67 (D.D.C. 2008). They expanded that, "[C]ontinual evaluations [a]re necessary, and parents must have the ability to seek redress for a school's failure to sufficiently monitor a child's progress under the IEP" Id. at 68 (*citing Honig*, 484 U.S. at 311-12). The court in Harris found that a failure to act on a request for an evaluation of a child "is certainly not a mere procedural inadequacy; indeed, such inaction jeopardizes the whole of Congress' objectives in enacting the IDEA." (Id. at 69.) Under the standard established in *Harris*, APS's failure to test R.S. would have not been "merely a procedural inaccuracy," but rather substantive violation of the procedures of the IDEA that impedes FAPE.

84. In fact, had APS conducted the evaluations and afterwards reviewed and determined that

no change to R.S.'s IEP was warranted, then the Parents may not have a claim on these grounds. In this case, however, APS not only failed to properly evaluate R.S., despite multiple prompts from the Parents that they do so, they actively ruled out potential disabilities without the benefit of those evaluations. (P Ex. 13, 22, 38 pg. 002);(J. Smith Test pgs. 421-422 ¶¶1-22, pg. 435 ¶¶14-16).

85. Lastly, APS has argued that, based on the time of the complaint, Parent's claim to the 2017 eligibility determination should be time barred. However, the Parent rightfully submitted their due process complaint on November 12, 2019 and merely filed an amended complaint on January 1, 2020. Federal Rule of Civil Procedure rule 15 governs timelines for amended or supplemental pleadings. It states, "(1) An amendment to a pleading relates back to the date of the original pleading when:...(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading" Fed. Rule of Civ. Proc. 15(c)(1)(B). In this case, because the original pleading was Parent's initial, pro se, filing on November 12, 2019, this claim is time stamped on that date. That date is also within the two year statute of limitations for IDEA matters of the December 2017 eligibility and thus is properly introduced in this hearing.

86. Based on the above arguments, it is clear that APS denied R.S. the benefit of a FAPE by failing to properly evaluate him in areas of repeated concern and consistent with multiple requests by the Parents, even if those requests did not come at the time of the eligibility.

**II. APS Failed to Properly Review Evaluation Data While Conducting Both the August and October 2019 IEPs.**

87. Once an Independent Educational Evaluation ("IEE") at public or private expense has been conducted, the school district is required to consider the result of the IEE. 34 CFR 300; 8 *VAC* 20-81. The same is true for evaluations conducted the by the school district. Id. In this case, APS failed to properly review any of the evaluations conducted by either themselves or privately by Dr. Theis. (P Ex. 30c; 30d);(Zipfel Test. pg. 554 ¶¶5-6);(Koval

Test. pgs.616-618 ¶¶3-4). According to Ms. Koval, APS reviewed the evaluations by summarizing them in the present levels of performance. (Koval Test. pg. 617 ¶¶3-6). However, as stated if the facts above, much of the Present levels of performance, particularly in regard to language skills and pragmatic language, remained unchanged since 2017. (APS Ex. 45 pgs. 009-011);(P Ex. 12 pgs. 005-010).

88. At no point during any IEP meeting were the specific results of the many recent evaluations actually reviewed by the IEP team. Instead, APS chose to roll over the goals and present levels from previous IEPs. Had APS not had access to all of the additional data, this may have been appropriate, however the record shows that APS had numerous sources of additional data to draw from following the 2017-2018 school year. The evaluations are an example of such data.

89. R.S. is a student with complex and compounding disabilities, by not properly reviewing the evaluation documentation, APS committed a procedural violation that prevented themselves from being able to propose an IEP that meets all of R.S.'s needs. During their testimony, and in argument, APS and their counsel repeatedly asked whether the Parents, or their experts, had specifically asked the IEP team to review the evaluations or considered individual goals. (S Smith Test. pg.403 ¶¶7-10);(Reid Test. pg. 124 ¶¶1- 8);(Parks Test. pg. 197 ¶¶9-17). However, the 11th Circuit held in *Phyllene* that, "[A] child's entitlement to special education should not depend upon the vigilance of the parents. Rather, it is the responsibility of the child's teachers, therapists, and administrators -- and of the multi- disciplinary team that annually evaluates the student's progress -- to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly." *Phyllene W. v. Huntsville Ct. Bd. Of Ed.* 630 F. App'x 917, 925-926 (2015). APS has attempted to shift this burden to the Parents. However, the Parents have provided APS with every evaluation and observation consent they have asked for, they have provided them with

their own, privately sought evaluations, documents from St. Agnes, and access to Anne Reid.

(J Smith Test. pgs. 351 ¶¶6-16; 367 ¶¶7-22)(P Exs. 7, 8, 9, 17). It is unreasonable to suggest

that, because the Parents did not force APS to review the evaluation data and actually update

their IEP, that somehow APS is relieved of the burden of doing so. In fact, even if APS had

wanted to review the evaluation data, they would have been unable to because they did not

invite either a speech language pathologist or a school psychologist to either IEP meeting.

(APS Exs. 45-001, 50-001).

90. As a result, because APS failed to properly review and incorporate the results of

evaluation data into R.S.'s IEP, they failed to develop an IEP that provides him FAPE.

### III. APS Failed to Permit the Parents a Reasonable Opportunity to Participate in the IEP Process by Failing to Provide them with Proper, and Accurate, Information in Either their Most Recent Proposed IEP or PWN.

91. It is important to note that the IDEA lists Parents as the first members of the IEP

team. *34 C.F.R. 300-321; 8 VAC. 20-81-110(C)(1)(a)*. The procedural safeguards include a

parent's right to "Participate in meetings with respect to the identification, evaluation, and

educational placement of the child and the provision of a [FAPE] to the child." *34 C.F.R.

300.501; 8 VAC 20-81-170(A)(1)(a)(2)*. The IDEA states that a group that is comprised of the

same individuals as an IEP Team shall determine, based upon a review of existing data, whether

additional data is needed to determine eligibility, among other things. *34 C.F.R. 300.305 and

307; 8 VAC 20-81- 70(B)*. Notice has always been considered a necessary procedural

component to Parental participation in the IEP process.

92. Also essential to a parent's ability to participate in the development of their child's

educational program is the procedural requirement that the school district provide sufficient

notice before it makes substantial changes to the student's educational program. 34 CFR §

300.503(a). In this case, Parents have alleged that APS denied them a meaningful opportunity to

participate in the development of R.S.'s educational program by failing to provide prior written

notice of the change in placement or change in accommodations following the October 2019

IEP. As stated, in the record, APS never presented the Parents with a copy of the most recently proposed IEP until they did so in discovery of this due process. (J. Smith Test. pg. 459 ¶¶20-22);(Doll Test. pg. 663 ¶¶13-16). Additionally, the PWN provided by the district, which could have clearly outlined the changes proposed in the IEP, lacked the specificity to make up for the Parent's not having access to the IEP. (P Ex. 19 pg. 002).

93. A school district must give a parent prior written notice a reasonable time before it proposes or refuses to change the educational placement of a child. 34 CFR § 300.503(a). In a decision held by an Independent Hearing Officer ("IHO") in Colorado, it was held that "The content of the notice was inadequate because it simply documented that a possible change in placement would be discussed at the upcoming IEP meeting rather than documenting the change of placement actually proposed." *Mesa Cnty. Sch. Dis. 51*, 68 IDELR 84 (2016). In this case, the content of the PWN merely states that some change has been made to the IEP, but not what change. They use statements such as "The IEP team reached consensus to increase services" and " The team also reached consensus for accommodations" but do not identify what amount of service increase, in what academic areas/classes, or what specific accommodations where being added. (P Ex. 19 pg. 002).

94. In a case before the U.S. District Court of the District of Columbia, *Smith v. Theresa Squillacote, et al,* the court found that, "The purpose of the notice requirement is to ensure that parents receive sufficient information about where the agency proposes to place their child and why that placement was chosen, so that parents may reach an informed conclusion about whether the placement will provide an appropriate education." *Smith v. Theresa Squillacote, et al,* 800 F. Supp 993, 997 (1992). The court continues, "The information in the notice, along with the IEP, the MDT Report, and all other information the agency has provided to the parents, should enable them to decide whether to contest the placement. If the notice provides such information, then it is sufficient." Id.

95. Again, because the Parents were not provided a copy of the IEP, the notice requirements of the IDEA properly require the PWN to provide information necessary for the Parents to make a reasonably informed decision regarding the appropriateness of the proposed IEP. As stated above, the PWN did not meet this standard. In fact, even APS's own expert witness testified that, based purely on the language of the PWN, she could not discern what changes were being made to the IEP. (Doll Test. pgs. 664-665 ¶¶4-16). If a licensed special educator could not discern what changes were made, it cannot be expected that the Parents will.

96. During testimony, APS counsel asked the Parents why, after not receiving the IEP document from the October 2019 meeting, they did not contact the school to acquire. The answer is that the Parents did not believe any changes had been made to the IEP document and did not have the requisite knowledge to deduce from the PWN that such had been completed. (J Smith Test. pg. 470 ¶¶1-22). According to parent testimony, and as supported in the recording on record, there was much confusion during the meeting regarding the discussion around changing R.S.'s service hours to reflect self-contained classes (P Ex. 30d);(J. Smith Test. pgs.466- 467¶¶10-8). Additional, Ms. Koval testified during the hearing that, in cases where no changes are made the IEP documentation, it is not uncommon for only a PWN to have been generated from the meeting and provided to the parents. (Koval Test. pgs. 622-623 ¶¶21-13). As such, again, it was reasonable for Parents to assume the same was the case in this instance.

97. Lastly, even if the Parents had eventually been provided notice of the changes made to R.S.'s IEP, they were never provided it in a manner consistent with the procedural mandates of the IDEA. In an OSEP guidance letter, Letter to Chandler, OSEP explained that, "Notice must be provided so that parents have enough time to fully consider the change and respond to the action before it is implemented." *Letter to Chandler*, 59 IDELR 110 (OSEP 2012). Included in this timeliness requirement is also, presumably, a requirement that the Parents are

provided enough time to fully consider the proposed IEP before having a decision held against

them. In this case, not only where the Parents never given a copy of the proposed, but they

were never even given an opportunity to review the proposed changed before APS unilaterally

determined that the Parents were not in agreement. The PWN states, " At the conclusion of the

meeting, both parents verbally rejected the proposed APS IEP." (P Ex. 19 pg. 002). However,

neither Parent was ever presented anything to verbally agree or disagree with. Certainly,

neither Parent ever signed the IEP in disagreement3. As stated above, until shortly before the

actual date of the due process, the Parents, nor their counsel, was ever aware changes had been

made to the August 28, 2019 IEP.

98. Under the IDEA, for a parent to properly participate in the IEP process, the school

district has an affirmative obligation to provide them not only with notice of the proposed

changes to the IEP, but also with substantial enough time to make an informed decision. In this

case, APS not only failed to actually provide clear documentation of their proposed changes,

they then held Parents statements during the IEP as a clear rejection of a document they had

never been provided. Should APS be permitted to benefit from such action, it would establish a

dangerous precedent that impedes the rights of Parents to the notice provisions above. As such,

you should find that APS procedural violations with regard to denial of Parental participation

and notice requirement resulted in a denial of a FAPE.

**B.) APS Committed Substantive Violations of the IDEA Which Resulted in a Denial of
FAPE to R.S. by Failing to Draft an Appropriate IEPs for the 2019-2020 School Years
that Meets R.S.'s individual needs and circumstances and offered him a FAPE.**

99. When developing a special education student's IEP, the appropriateness of that

student's education must be decided on a case-by-case basis, in light of their unique needs. *Bd. of*

*Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 553 IDELR 656 (U.S. 1982). According

to the two-part Rowley test, the state must (1) comply with the procedures set forth in the IDEA, as

well as (2) develop an IEP that is reasonably calculated to enable the child to receive educational

benefits. Id. In addition, the Supreme Court of the United States of America held in *Endrew v. Douglas Cty. Sch. Dist. RE-1*, that in order to meet the second prong of the two-part Rowley test regarding a school district's substantive obligation under the IDEA, ". . . a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew v. Douglas Cty. Sch. Dist. RE-1*, 2017 WL 1066260 (2017). The Court also stated that "the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." Id.

### I. APS Failed to Propose Appropriate and Measurable Goals for the 2019-2020 School Year

100. In addition to the identification of a student's needs according to his disabilities, in order to meet the first prong of the Rowley standard, an IEP must include a statement of measurable annual goals, to include academic and functional goals that are designed to (1) meet their needs according to their disability to enable the child to be involved in and make educational progress, and (2) meet each of the student's other educational needs arising from their disability. 34 CFR 300.302(a)(2)(i); 8 VAC 20-81-110(G)(2). When measuring the appropriateness of a student's goals, one must also look at whether or not the goals are achievable within the annual timeframe of the IEP, as well as whether the goals are being met on a yearly basis or being carried over year to year. If a student's goals are repeated year after without mastery then it is clear that both the goals are inappropriate and the student is failing to make sufficient progress.

101. The goals proposed by APS in the October 2019 IEP do not appropriately meet R.S. needs because: 1.) The Academic goals are based on 4th grade standards that have largely already been met by R.S.; 2.) They lack specificity and measurability, and 3.) They fail to provide support for each are of R.S.'s needs.

102. As stated above, the IDEA requires that goals for a student are not only master-able, but that they are appropriately ambitious. *Endrew v. Douglas Cty. Sch. Dist. RE-1*, 2017 WL 1066260 (2017). In this case, APS has failed to propose appropriately ambitious goals by

continuing to propose goals that have been carried over from R.S.'s 4th grade year. (APS Ex. 45 pgs. 011-013);(P Ex. 12 pgs. 008-011). As stated above, Ms. Doll reiterated in her testimony that these goals were drafted based on fourth grade standards of learning. However, as shown in the evaluations conducted by both APS and Dr. Theis in 2019, R.S. had actually made consistent academic progress since the 2017-2018 school year in both mathematics and reading (both of which he was roughly on grade level). (P Exs. 7, 9, 15). As a result, many of R.S.'s goals were not developed with his current academic abilities in mind. (Livelli Test. pg. 271 ¶¶2-21).

103. Secondly, in order for goals to be appropriate under the standards established in Rowley and Endrew, it is necessary for the goals to be sufficiently precise and measurable. Vague or indefinite goals will not be considered sufficient under this measure. In his testimony, Dr. Livelli specifically stated his concerns with a number of the goals for these reasons. (Livelli Test. pgs. 271-274 ¶¶22-3). In particular, Dr. Livelli expressed concern with R.S.'s proposed reading comprehension goal. He states, "I don't think this goal is measurable. I'm not sure what they mean by implicit and explicit questions and I'm not sure he's answering them with 80% accuracy over time." (Id. at 272 ¶¶9-15). His testimony then continued to state concerns with the written expression goal being based on handwriting and legibility. (Id. at 273 ¶¶4-17). Lastly, R.S. lone goal in the area of social/emotional functioning is also unmeasurable. The goals states, " By 08/27/2020, Bobby will participate appropriately with peers in group activities by following the rules of the activity and using materials as meant to be used with no more than 1 teacher prompt." (APS Ex. 45-014). However, it is vague and unclear how one is expected to measure what "participate appropriately with peers" and "following the rules of the activity and using the material as meant to be used" actually means in any given circumstance. In her testimony, Ms. Reid stated, "I would be very interested in how that goal is going to be measured and have data on... I don't how the teacher is going to be keeping data on this." (Reid Test. pg. 106 ¶¶2-15).

104. Lastly, it is clear in the record that, specifically with regard to the development of social/emotional skills, the proposed goals do not meet all of R.S.'s needs. Both Dr. Theis's 2019 Evaluation and the speech/language evaluation conducted by APS in August 2019 show that R.S. presents with numerous issues related to pragmatic language development and social skills. (P Exs. 7, 8). Throughout the hearing, there was a lot of testimony and evidence regarding the complex issues R.S. has with social interactions dating as far back as 2015. (P Exs. 7, 8, 9, 20, 38, 43, 44);(APS Ex. 22);(S. Smith Test. pg. 325 ¶¶7-15);(J. Smith Test. pgs. 429-430 ¶¶20- 13);(Reid Test. pgs. 95-96, 106-107 ¶¶20-3);(Theis Test. pgs. 33-34 ¶¶17-6);(Livelli Test. pgs. 264 ¶¶4-20, 274-275 ¶¶16-8);(Parks Test. pgs. 174-175 ¶¶17-22, 179-180, 184 ¶¶1-16);(Doll Test. 655-656 ¶¶10-16). However, despite the plethora of evidence and data supporting this as one of R.S.'s most pressing area of need, there is almost no goal support in the IEP for the development of these skills.

105. Without the direct instruction that goals require, R.S. will not be able to develop the necessary social skills to be successful throughout his academic career. (Dr. Theis Test. pg. 43 ¶¶3-8);(Parks Test. pg. 180 ¶¶7-16);(Doll Test. 655-656 ¶¶10-16). As stated by Dr. Livelli in his testimony, "autism is a social deficit. That's what autism is all about. And so there's deficits here and it's evident in the record. We have to address that with the goals and objectives and explicit teaching. (Livelli Test. pgs. 275-276 ¶¶10-16). Ms. Doll, APS's own witness talked about the importance of the goals in an IEP by stating, "Yes. The goal -- the IEP or, in this case, the goal drives -- determines everything we do." (Doll Test. pg.650 ¶¶11-18). In order for the school to properly understand how to instruct a student, they must first have a complete and accurate understanding of that student's needs. In this case, the goals provided by APS would not provide his instructors with the necessary roadmap to work with him on the areas he most pressingly needs. In testimony, Ms. Doll stated a number of different social instruction methodologies that could be implemented by APS as well as the various supports at Williamsburg Middle School. However, she also specifically stated that the delivery of these supports is directly tied to the student's goals. (Id.) Therefore, no matter how much

APS would like to claim that they can provide to R.S., if it is not on the IEP, it is not provided to him.

106. Based on the above, it is clear that R.S.'s goals do not meet his needs. This is even more true when one considers the fact that, from 2017 to his most recent IEP from October 2019, not once have any goals been added, changed, or removed from R.S.'s proposed IEP. As mentioned above, not only have the goals remained static year after year, the goal areas were not updated even following the addition of two eligibility categories (Autism and OHI) and the introduction of three separate evaluations. In order for R.S. to make progress globally, he requires a very specific level of support and instruction. Without the kind of direction that goals provide to his instructors, he will not be able to make proper progress. Worse, without the kind of social sills development only possible through direct instruction, not only will R.S. fail to develop in this area, he may continue to be the subject of harassment and bullying by his peers. As a result, APS's failure to draft appropriate, and measurable, goals for R.S. has resulted in them denying him a FAPE.

**II. APS Failed to Propose Appropriate Services for R.S. by Not Considering Speech/Language as a Related Service.**

107. As mentioned above, the second prong of the *Rowley* standards also requires that the IEP "meet each of the student's other educational needs arising from their disability." *34 CFR 300.302(a)(2)(i); 8 VAC 20-81-110(G)(2).* Here, again, APS has failed to meet this standard with each proposed IEP from 2017 to the present. Despite a clear recommendation by Dr. Theis in her private evaluation and acknowledgment of the deficit in their own Sp/L evaluation, no Sp/L services or even goals were proposed or added to R.S.'s IEP. (P Ex. 7 pg. 022, 8 pg. 006). As a young student with recently identified Autism, it is imperative that R.S. develop the necessary conversational and social skills to be successful later on in his educational career. (Dr. Theis Test. pg. 43 ¶¶3-8);(Parks Test. pg. 180 ¶¶7-16). As evidenced by his interaction and struggles at St. Agnes, R.S. requires a significant amount of direct instruction in these areas. (P Ex. 20). However, again, this is not referenced in any of his IEPs.

108. In her testimony, Ms. Parks stated that, given the "educational considerations" component of the APS Sp/L testing, she would have determined that R.S. requires direct speech services to make up for his areas of deficit. (Parks Test. pg. 184-185 ¶¶17-5). However, because the APS testing was never reviewed by the IEP team and no Speech/Language Pathologist ever attended any IEP meetings, this was never included on the proposed IEP. Due to the severity of R.S.'s needs in this area, the failure to provide this support is a denial of FAPE.

**III. APS Failed to Propose an Appropriate Academic Placement for R.S. for the 2018-2019 and 2019-2020 School Years**

109. R.S. is a student with unique and specific needs. Not only is he a student who is impacted by his Dyslexia and Specific Learning deficits in Writing, but he is a student who struggles with visual motor integration and social responses and pragmatic language as a result of his Autism. Each of these separate disabilities has an intertwining and compounding effect on him. Despite all this though, R.S. is a capable student. He possesses cognitive abilities that are at, and in some cases above, grade level. Although he struggles with standardized testing measures, provided the right accommodations and support, R.S. is more than capable of grasping and progressing with grade level material.

110. As a result, R.S. requires an educational environment that limits his exposure to distracting elements while also providing him with direct 1:1 redirection and instruction presented to him a manner that limits the impact of his visual motor deficits. In her private evaluation, Dr. Theis specifically recommends that R.S. would perform better in a small environment. (P Ex. 7 pg. 022).

111. The Parents presented these concerns to APS over a number of different formal and informal meetings. In particular, they provided the results of Dr. Theis' evaluations with APS and deferred to her recommendations. However, APS's consistent proposals of a predominantly General Education environment do not meet these standards and are inappropriate for R.S. The general education environment contains too many distracting elements while also introducing concerns

related to the amount of direction R.S. requires. During the APS OT Coordinator's observation of

R.S. at Newton, the teacher noted that even in their small classroom environment, R.S. requires

more frequent attention and redirection than her other students. (P Ex. 11). A general education

environment would serve to create a situation by which R.S. would require even more frequent

redirection (due to the increased distraction and other classroom elements) but would also have less

support available to him. Additionally, R.S. current proposed IEP contains a number of

accommodations that would be too onerous on the instructing time of a general education teacher.

(APS Ex. 50 pg. 014). In her testimony, Ms. Doll stated that all of these accommodations would

need to be provided by the classroom instructor at Williamsburg. (Doll Test pg. 656-658 ¶¶17-5).

112. In response to the Parent's request for a smaller classroom environment, APS also

proposed placing R.S. in a self contained environment for both his reading and writing courses.

However, this self-contained environment at Williamsburg is not an appropriate placement for him

because it would surround him with lower functioning peers. (Zipfel Test. pgs. 534-535). R.S.

requires age-appropriate peer groups to develop the kinds of social and pragmatic language skills

necessary to be successful. (Theis Test. pg. 43-44 ¶¶19-9);(Parks Test. pg. 181-181 ¶¶18- 15).

113. Due to the unique nature of R.S.'s disabilities and needs, he requires a placement

that can simultaneously provide him with the re-direction and attention necessary for him to grasp

instruction while also providing him with an age appropriate peer group to model from. In a larger

classroom environment he is likely to require more support than is available to him not only

academically, but also behaviorally. However, in a small classroom at the public school level, he

will not be able to surround himself with the kinds of peers necessary to support the development of

his social skills. For these reasons, there is no appropriate placement for him within APS. As a

result, APS failure to identify him as a student requiring private placement is a denial of FAPE.

**C.) Due to APS Failure to Propose and Appropriate IEP for R.S., The Parents Placed R.S. Privately and to the Best of Their Ability at The Newton School and Therefore are Entitled to Reimbursement by Law.**

114. The IDEA states that a hearing officer may require a school district to reimburse parents for the cost of unilateral parental placement in a private school if the hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to the enrollment and the private placement is appropriate. 34 C.F.R. § 300.148(c). The United States Supreme Court further stated in Florence Cnty Sch. Dist. Four v. Carter, in order to receive tuition reimbursement, parents only need to show that the public school placement was improper under the IDEA and the private day school placement was reasonably calculated to provide an educational benefit. Florence City Sch. Dist v. Carter, 510 U.S. 359, 370, 374 (1985).

115. In this case, it is clear that APS failed to provide R.S. with an IEP designed to offer him FAPE since at least the 2017-2018 school year. The Parents repeatedly requested updated testing and changes to their son's IEP and the result was the school's assurance R.S. was progressing fine while the Parents watched him struggle. Following their attempts to resolve their concerns with the school district, the Parents elected to remove him from APS to provide him an appropriate education. However, the Parents do concede that, due to issues related to proper notice and the faith-based nature of St. Agnes, they will most likely not receive reimbursement for R.S. 5th grade year. Therefore, the Parents are seeking reimbursement for tuition and other expenses related to R.S.'s enrollment at The Newton School for the 2019-2020 school year.

116. Additionally, the record clearly shows that the Parents gave proper notice to APS of their intent to enroll R.S. at public expense on May 13, 2019 (P Ex. 21). However, Parents also participated, without predetermination in the IEP process until October 2019 when it became clear that APS would not offer R.S. an appropriate IEP. (J. Smith Test. pgs.441-446). The Parents did however pay tuition for The Newton School prior to the conclusion of the IEP process to ensure that R.S. would have a placement if no appropriate IEP could be reached.

**I. The Newton School is an Appropriate Placement for R.S.**

117. As stated by the supreme court in *Florence*, a parent can only receive reimbursement for a unilateral placement if the placement they have chosen was "reasonably calculated" to offer their child FAPE. Under the supreme court's ruling, the "reasonableness" standard is as applied to Parents, not educational experts. *Florence City Sch. Dist v. Carter*, 510 U.S. 359, 370, 374 (1985). Therefore, the court will not unnecessarily penalize Parents for making decisions to the best of their ability, but that do not consider all of the elements an educational expert or medical professional might have.

118. All of that being said, The Newton School provides R.S. with an educational environment that is more than capable of meeting all of his unique needs. Although The Newton School is not a certified special education program by the VDOE, they are accredited by AdvancedED and their teachers and staff are trained in assistive technologies, academic therapies, and multi-sensory strategies. (P Ex. 29);(Abraham Test. pgs. 206-221). The Newton School also does have students with disabilities and was originally created by the founder, Allison Abraham ("Ms. Abraham"), for the purpose of educating her disabled son. (Abraham Test. 205 ¶¶11-18, 221-222 ¶¶13-6). The Newton School's academics are aligned with the Virginia Standards of Learning. Additionally, The Newton School includes an in-house Occupational Therapist and Speech/Language Pathologist who work with the students. (P Ex. 29);(Abraham Test. pgs. 206-221).

119. The Newton School also employs a social curriculum for all students as developed and supported on a weekly basis by the Speech/Language Pathologist. R.S. receives two hours per week of direct social skills instruction from Ms. Parks5. (Parks Test. pg. 171 ¶¶17-22). This curriculum combines group work and social development to teach necessary social and conversational skills to the student body. Ms. Parks also occasionally brings in a specific other student to work directly with R.S. (Id. at 190 ¶¶8-11). Included in this is one hour per week

dedicated solely to R.S.'s social skills development. (Id.).

120. R.S.'s classroom consists of one teacher to six students. (Id. at 189 ¶¶12-14). The classroom makeup involved the use of a SMART board and is designed to limit distractions for the students. Dr. Livelli conducted an observation of R.S. at the Newton School (Livelli Test. pgs. 259-270). Based on his observation, Dr. Livelli saw R.S. accessing the supports available to him. He stated, "The directions were clear, they were specific. [R.S.'s Teacher] was checking language for him. She was checking in. She didn't over-prompt. She gave him a lead but didn't give him the answer. He had to come up with the answer." (Id. at 259-260 ¶¶20-3). Ultimately, Dr. Livelli testified that, based on his own observation and review of the record, he felt that R.S. was making meaningful progress at Newton. (Id. at 310 ¶¶7-20). In fact, he stated:

> This teacher seemed to understand the nuances of Bobby; right? So she knew when to check in, she knew how to give a prompt. Whether she's special education trained or not -- and I didn't ask her about her training -- whether she's special education trained or not, she knew, How can I give this kid what I would call discriminative stimulus and open questions that I don't give him the answer but he has to start the data and think how to perform? (Id. at 311 ¶¶4-14).

121. Most importantly, R.S. has already been able to make progress since the beginning of this school year. (P Exs. 10, 28). Although his teachers report that he does require frequent redirection, they are able to quickly provide it to him and he is able to complete all his work and follow the lesson. R.S. is also interacting more frequently with his peers in less structured setting, although he still does not engage with them during structured class time.

122. Given all of the above, and applying the reasonableness standard from Florence, it is clear that The Newton School is an appropriate placement for R.S.

### II. Even if the Hearing Officer Does Not Determine that Private Placement is R.S.'s Least Restrictive Environment, R.S. Should Still be Given Private Placement as a Compensatory Award.

123. Although there is ample evidence to support The Newton School as R.S. appropriate academic placement, even if the Hearing Officer does not find this is true, R.S. can still be given private placement as a compensation for APS failure to draft an appropriate IEP. The IDEA states that a hearing officer may award the relief that they determine to be appropriate, which may

include compensatory educational services. 34 CFR 300.516(c)(3). These compensatory services may include reimbursement for private services parents must pay for due to the school district's refusal to provide those services. I.T. v. Dept. of Educ., State of Hawaii, 62 IDELR 178 (D. Hawaii 2013). These compensatory services can also include placement in a private school.

124. Due to the unnecessary and unreasonable delay APS caused by failing to properly evaluate and program for him, R.S. has failed to make progress appropriate with his age/grade in a number of key areas. As such, it is appropriate for the Hearing Officer to award Private Day placement through his IEP as a means of expediting his progress to permit him the opportunity to approach the level of progress he would have made had he received FAPE by APS.

## V. RELIEF REQUESTED

Due to APS's failures, R.S. requests that the Hearing Officer order APS to:

1. Develop an IEP containing appropriate Goals, Accommodations, Services that incorporates the recommendations made by Dr. Theis;

2. Develop an IEP containing appropriate Placement, specifically The Newton School;

3. Reimburse the Parents for tuition and other expenses during the 2019-2020 school year at The Newton School;

4. Reimburse the Parents for tutoring and other expenses related to APS failure to provide R.S. with FAPE;

5. The Parents reserve the right to seek reasonable attorneys' fees under the IDEA as part of the costs of this action;

6. Any other relief the Hearing Officer deems appropriate.

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July 2020, I will electronically file the foregoing with the Clerk of County using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John F. Cafferky
Attorney at Law
4020 University Drive, Suite 300
Fairfax, Virginia 22030
jcafferky@bklawva.com

_J A_

James P Atkinson (VSB No. 92001)
Law Office of Grace E. Kim, P.C.
11325 Random Hills Road Suite 360-110
Fairfax, VA 22030

(703) 225-3395      _phone_
(703) 225-3333      _fax_