IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

XXXXXX, a minor, by his Parents and Next )
    Friends, Jeffrey and Sharon Smith, )
                                  )
        Plaintiffs, )
                                    )
                                    )   1:20-cv-817 (LMB/TCB)
    v. )
                                      )
ARLINGTON COUNTY SCHOOL BOARD, )
                                      )
        Defendant. )

## MEMORANDUM OPINION

Before the Court are cross motions for summary judgment in an action brought under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., in which the

plaintiffs, a minor child identified as "XXXXXX" and the child's parents, Jeffrey and Sharon

Smith, allege that the Arlington Public School System ("APS" or "defendant")[1] failed to provide

XXXXXX with the free appropriate public education ("FAPE") required by the IDEA, and that,

as a result, they should be reimbursed for the expenses they paid for XXXXXX attending a

private day school, Newton School ("Newton"), during the 2019–2020 year. Plaintiffs also argue

that APS should be required to place XXXXXX at Newton going forward. The defendant

responds that it fully complied with the IDEA by providing appropriate individualized education

programs ("IEPs") for XXXXXX in the least restrictive environment when XXXXXX attended

Nottingham Elementary ("Nottingham") and by proposing placement at Williamsburg Middle

School ("Williamsburg"), XXXXXX's neighborhood school, in the proposed 2019–2020 IEP.

---

[1] Because it is the proper defendant in a case against a school system, the defendant in this action
is the Arlington School Board; however, the references throughout the pleadings and
administrative record are to the Arlington Public Schools.

Plaintiffs have exhausted the IDEA's required administrative procedures by presenting their disputes to an independent hearing officer. The hearing officer conducted a three-day administrative hearing in which 14 witnesses, whose testimony comprises over a thousand pages of transcripts, testified. The lengthy administrative record also included 124 exhibits. The hearing officer ruled against plaintiffs on all claims. In addition, even though plaintiffs had not included a claim for the reimbursement of their expenses in obtaining a private neuropsychological evaluation of XXXXXX completed by Dr. Kelly Theis ("Theis") for 2019–2020, the hearing officer sua sponte awarded "reasonable expenses" for that evaluation to plaintiffs. Plaintiffs timely appealed the decision to this court, and the APS has cross-appealed the reimbursement of the neuropsychological evaluation. Oral argument on the cross motions for judgment was originally scheduled for May 25, 2021. At plaintiffs' request, the hearing was continued to June 25, 2021. In the interim, the Court has completed its evaluation of the entire record and determined that oral argument will not assist the decisional process. Accordingly, the motions will be decided on the papers submitted. For the reasons explained below, defendant's Motion for Judgment on the Administrative Record and Counterclaim [Dkt. No. 21] will be granted, plaintiff's Motion for Summary Judgment [Dkt. No. 26] will be denied, and judgment will be entered in defendant's favor.

I.   BACKGROUND

A. **Factual Background**

XXXXXX is a sixth grader who has been diagnosed with autism spectrum disorder ("autism"); attention deficit hyperactivity disorder ("ADHD"), predominantly inattentive type; other specified neurodevelopmental disorder with visual motor integration deficits; specific learning disorder with impairment in reading and reading comprehension (dyslexia); and specific learning disorder with impairment in written expression. [Dkt. No. 26] at 4. XXXXXX attended

2

his neighborhood APS school, Nottingham, from kindergarten through fourth grade. Since first grade, he has been identified as eligible for special education under the classification of specific learning disorder, based on identified weaknesses in the areas of reading, writing, and math. AR 9. In 2017, he was found eligible to continue receiving special education services under the same category. AR 23. Most recently, on August 7, 2019, he was found eligible for continued services under the category of specific learning disorder as well as autism and other health impairment based on a diagnosis of ADHD, predominantly inattentive type. AR 43.

XXXXXX began his fourth grade year in 2017 with an IEP developed and agreed upon by APS and his parents on February 13, 2017. The IEP provided for 14.5 hours per week of specially designed instruction in reading, writing, math, self-advocacy, and organization in the general education setting in a team-taught classroom. AR 17. Additionally, the IEP provided XXXXXX with occupational therapy ("OT") for 30 minutes per week in the special education setting, and an additional 30 minutes per month of the same service in the general education class. AR 17. On September 25, 2017, the parents and APS agreed to an amended IEP, which included goals in motor functioning, attention/organization, reading decoding, reading comprehension, written expression, spelling, math reasoning, and self-determination. AR 20. The IEP also included numerous accommodations such as extended time on tests, quizzes, and assignments, adapted paper and pencils, frequent movement breaks, visual aids, repetition of directions, shortened assignments, and an audio accommodation for the math and reading Standards of Learning exams ("SOLs"). AR 20. As an informal intervention not part of his IEP, XXXXXX also received support in his peer relation skills through a behavior chart and social skills lessons. AR 110-219–20; AR 111-233–35.

On November 6, 2017, ahead of XXXXXX's triennial reevaluation, a team convened to discuss his eligibility classification. AR 23. Team members agreed that no further testing of XXXXXX was required because there was already enough information available about him. The parents agreed with that finding.[2] AR 23. On December 4, 2017, Jeffrey Smith emailed Sarah Garratt ("Garratt"), XXXXXXX's first, third, and fourth grade special education teacher, to ask "why re-testing may not be desired and . . . if [she] could provide some color. [XXXXXX's

---

[2] Specifically, the November 6, 2017 Eligibility Letter, which was signed by Sharon Smith, stated:

> The parent/guardian reviewed existing data and participated in the decision regarding the need to gather additional data.

> On the basis of the review of existing data and input from the student's parents, the team determined that parent/guardian was informed of the reasons for the team's decision not to collect additional data and of their right to request that additional data [be] collected.

AR 23-004. At that meeting, the team reviewed teacher narratives, classroom observations, the prior evaluation, report cards, SOLs, a Developmental Reading Assessment demonstrating mid-third grade reading abilities, a Phonological Awareness Literacy Screening score indicating skills between third and fourth grade, a Word Study score indicating slightly underdeveloped spelling skills, and parent input. AR 110-252–53; AR 23. APS Psychologist Christine Zelenak ("Zelenak"), who was present at the November 6, 2017 meeting, explained that the team did not find it necessary to conduct more testing because XXXXXX was clearly still eligible for special education services and because "there were no other significant concerns that were reported by the teachers that would lead us to suspect a different disability." AR 110-254. She further stated:

> [T]here were no observations or reports from teachers that would have led us to suspect what I understand his diagnosis was in 2019, the autism. That was never mentioned as a concern, or behaviors that would have led me to say, hey, I think we should look at that as a possible disability. That was – none of those behaviors were discussed by parents or teachers. . . . And although there were some comments about him needing some prompting and some, you know, reminders and such, the reports from teachers regarding his attention were not significant to make us believe that there were any significant attention concerns, either.

> . . .

> We don't write an IEP based on a disability category. So it wouldn't matter if he was coded for ADHD or for a learning disability or for autism. If he had needs for X, Y, and Z, that's what he would get on his IEP. The disability category never drives the IEP.

AR 110-255–256.

vision therapist] seemed to think testing every three years was very helpful." AR 83-001.
Following that email, Garratt and Jeffrey Smith had a phone conversation, in which Jeffrey
Smith took notes. His notes reflect that Garratt's reasoning as to why testing was unnecessary
was that it was not needed to show that XXXXXX still qualified for an IEP, she had conducted
his original testing in first grade and "felt the strengths and weaknesses were already well known
and had not in fact changed" so that the IEP likely would not change, and that testing would take
away a lot of class time. AR 83-003.

At an IEP meeting on December 6, 2017, the team identified needs in the areas of
attention and organizational skills, math, fine motor skills, reading, social-emotional functioning,
spelling, and writing. As a result, the IEP included goals related to attention and organizational
skills, math reasoning, fine motor skills, reading decoding (fluency), reading comprehension,
social emotional functioning, spelling, and writing. AR 24. The IEP included 17 hours of direct
services in organization, math, reading, social/emotional, and writing areas, and one hour of
occupational therapy per week. Id. The parents agreed to the IEP. AR 24-019.

During his fourth-grade year, XXXXXX increased his Developmental Reading
Assessment score from 30 to 40, which represented approximately one year's growth and put his
functioning at a fourth-grade level. AR 110-206–07, 209. He achieved a fourth-grade level
Phonological Awareness Literacy Screening score, and his report card showed a full year of
improvement in his instructional reading level. AR 30; AR 110-209–11. In sum, XXXXXX was
primarily a B student, earning passing marks in all subjects and passing all of the SOLs.[3] AR 19;

---

[3] Although the parents state in their memorandum that XXXXXX failed his math SOL, they do
not provide any citations to the record. [Dkt. No. 26-1] ¶ 12. In contrast, Tricia Zipfel,
XXXXXX's fourth grade general education teacher, testified that a score over 400 on the SOLs
is passing, and that XXXXXX received scores of 438 in reading, 409 in math, and 442 in

AR 43-002; AR 45-006–07; AR 110-214–15. He also appeared to be making progress on his

issues interacting with peers during the course of the year and was doing slightly better in

attention and organization skills. AR 110-198; AR 19. He had a few friends, although he found it

difficult to keep them. AR 22. An IEP addendum meeting was held on May 2, 2018, in which the

team amended XXXXXX's IEP to include large print format assessments on his fourth-grade

math SOL, to which Sharon Smith agreed. AR 28-019. Around this time, the parents provided

XXXXXX with after-school math tutoring at Kumon Learning Center two days each week.[4] AR

110-024–25. The time frame in which the parents provided this tutoring is unclear, other than

that it lasted for three years. Id.

---

Virginia Studies (social studies). AR 110-241–15. These passing scores are also reflected in the
August 7, 2019 Special Education Committee Report and the August 28, 2019 IEP. AR 43-002;
AR 45-006–07.

The parents also claim that XXXXXX "performed poorly in his core academic classes" and that
his "academics continued to decline" after the December 2017 IEP meeting, but similarly do not
provide any citations to the record in support of these statements. Id. In contrast, XXXXXX's
report card shows improvement in areas such as instructional level in reading, effort in writing,
achievement in science, effort in vocal music, and organizing self and materials for task. AR 19.
His achievement in social studies initially went from a C to an A, and ended at a B. Id. His
achievement in math mostly remained constant at a B but went down to a C in the fourth grading
period, although he consistently remained at a fourth-grade level. Id. All other sections generally
remained constant, including achievement and effort in reading, achievement in writing, effort in
math, effort in science, effort in social studies, achievement and effort in art, achievement in
vocal music, achievement and effort in physical education, effort in health, achievement and
effort in in instrumental music, and a long list of work and social skills. Id. Accordingly, there is
no evidence in the record supporting the parents' claims that XXXXXX's academic performance
declined during his fourth-grade year.

[4] Plaintiffs' memorandum states that the parents provided XXXXXX with reading tutoring at
Kumon as well, and that the tutoring was for "approximately two hours a day year round." [Dkt.
No. 26-1] ¶ 11. This is not supported by the record and is explicitly contradicted by Sharon
Smith's testimony, in which she stated that they provided XXXXXX with math tutoring at
Kumon "two days a week, Mondays and Thursdays," and that she could not remember whether
they provided him with any reading instruction outside of school. AR 110-024–25. Plaintiffs'
memorandum also states that the parents provided XXXXXX with vision therapy at their own
expense during this time, but plaintiffs offer no citation to the record to support that statement.
[Dkt. No. 26-1] ¶ 11.

Around the winter of 2017, the parents notified APS that they were considering placing XXXXXX elsewhere, specifically in a Catholic school. In early February 2018, Jeffrey Smith did a classroom observation of XXXXXX in his pull-out reading and OT service hours at Nottingham, and he testified that he became concerned that the OT work was no different than what the parents were doing with XXXXXX at home, and that the small group time was not as small or for as long as the parents had thought it would be. AR 110-116–21. Additionally, Sharon Smith would sometimes drive by the school and see XXXXXX sitting alone on a bench in the playground, which made the parents concerned about his lack of friends.[5] AR 110-012, 117. At the close of the 2017–2018 school year, the parents enrolled XXXXXX at St. Agnes Catholic School ("St. Agnes") for the 2018–2019 school year.[6] XXXXXX did not do well at the

---

[5] XXXXXX's December 2017 IEP stated in the section "Social Emotional Functioning" under "Strengths" that "[XXXXXX] has friends that he interacts with during recess and social situations." In response to being asked if she agreed with that statement, Sharon Smith testified that:

> At the time, I may have. But that wasn't consistent throughout the year, and we need him to play with the kids every time – every day at recess. I mean, he had kids that he's known since first grade that I was friends with the parents, but that was me setting things up.

> But for him to initiate the play on the playground, it wasn't consistent. I mean, he would maybe play with somebody one day if I would talk to the teacher about it, but then the next day, he wouldn't. So it was a group of kids that he wanted to be friends with, and he was friends with like, one or two of them, but there was always somebody that was like, we don't want [XXXXXX] to play. And then the other two would just listen to – because they wanted to be part of that group.

AR 110-014.

[6] During the enrollment process, St. Agnes staff reviewed XXXXXX's December 2017 IEP. Kristine Carr, former St. Agnes principal, emailed the parents stating:

> Thank you for sharing [XXXXXX's] IEP with me and Dr. Eichner. We read over the IEP together and are impressed with the 17 hours of weekly services [he] receives through Arlington Public Schools. Our resources are limited at St. Agnes, and we would not be able to match or come close to his current services. Dr. Eichner and I both agree that Arlington Public Schools are a better fit for [him].

school, as he experienced teasing and bullying and was not able to have his academic and social

struggles adequately addressed by staff at St. Agnes.[7] See AR 56; AR 57; AR 109-042–43, 92–

93, 120, 140–46, 156–58. St. Agnes staff recommended that the parents have XXXXXX

privately evaluated. The parents took that advice. The private evaluation was completed by Dr.

Theis, who diagnosed XXXXXX with ADHD predominately inattentive type, autism, specific

learning disorder in the area of reading (dyslexia), specific learning disorder with impairment in

written expression, and other specified neurodevelopmental disorder associated with visual-

motor integration deficits. AR 68.

On May 24, 2019, Jeffrey Smith emailed Heather Rothenbuescher ("Rothenbuescher"),

APS Supervisor of Special Education, to request that APS pay for XXXXXX's placement at an

undisclosed private school.[8] AR 85. The St. Agnes vice principal, Reid, sent a letter to APS on

---

AR 26-001. Nevertheless, St. Agnes admitted XXXXXX, and the parents enrolled him there.

[7] Ann Reid ("Reid"), the vice principal at St. Agnes who began working at St. Agnes after XXXXXX was admitted, testified that there was a discrepancy between APS's documentation about XXXXXX and what she observed of XXXXXX when he started at St. Agnes:

> It didn't look like the same student just from what I saw in the classroom and what I saw on paper. What I saw on paper was like a student with ADHD, which we have several students with ADHD, and would need minimal support to stay on grade level with math and some reading. And what I saw was a student who was struggling to keep up on grade level, struggling with everything. Struggling with the social; struggling basically globally to function within the school setting and yet we were throwing every support we had at him to be successful. That's our goal, to make him be successful, and he was barely keeping afloat.

AR 109-091–92.

[8] In the letter requesting placement for XXXXXX in a private school, Jeffrey Smith wrote:

> Unfortunately, the school severely misunderstood my son's conditions, noting that he had a visual tracking issue and lack of short term working memory but failing to see what should have been clear to a trained professional. That is, his learning disabilities are significantly more than had been identified and for which accommodations were made. . .
>
> . . .

behalf of the parents on May 30, 2019, outlining her concerns about XXXXXX's education at

APS.[9] AR 81. APS convened an eligibility reevaluation planning committee meeting on June 17,

2019, before which plaintiffs notified APS of their intent to place XXXXXX at The Newton

School ("Newton"). AR 36. Committee members reviewed Dr. Theis' private evaluation. AR 36.

APS received consent to conduct new APS evaluations of XXXXXX and thereafter completed

psychological and speech and language evaluations. AR 36; AR 41; AR 42. Plaintiffs state in

their memorandum that

> [d]uring this meeting, the Parents expressed their concerns over the denial of FAPE by
> APS and requested that the school division place XXXXXX at The Newton School
> through his IEP. The APS members of the IEP team gave the Parent's [sic] the
> impression that they were open to the idea but that they would need to reengage in the
> eligibility process and conduct their own testing prior to privately placing XXXXXX[.]

---

> . . . A good system makes up for its mistakes and good people try to amend for what
> happens to a boy like [XXXXXX] and his family. My wife and I are asking that APS pay
> for this private education in accordance with the law that demands he be provided with a
> Free Appropriate Public Education. . . .
>
> . . .
>
> I have only teased a few elements of what I believe to be a disturbing story, the full story
> I believe will be even more shocking and disappointing to you and to the people of our
> county which otherwise take so much pride in our education system.

AR 85-004.

[9] In her letter, Reid stated:

> [XXXXXX] has not been given the correct tools to be successful in school. He has been
> denied the opportunity to be given strategies that will assist him as he gets older,
> academically, socially, and behaviorally. [XXXXXX] has 'gotten by', [sic] and thus was
> given the least amount of attention by the public school system; this has been a great
> miscarriage of justice. [XXXXXX] not just deserves, but has a right to, a free and
> appropriate public education. So far, Arlington County has denied that to him and his
> family. If we, the experts, do not get it right for the families who rely upon us, then who
> will?

AR 81-002.

[Dkt. No. 26-1] ¶ 30. After having XXXXXX evaluated, the IEP team ultimately recommended placement in public school. Although the parents complain that APS should have initially told them without any further testing or team meetings that private placement would not be possible for XXXXXX, that approach would have violated the IDEA.[10]

The psychological evaluation completed by APS revealed that XXXXXX was exhibiting some characteristics consistent with high-functioning autism. AR 42-005; AR 111-124. Brooke Zeller ("Zeller"), the APS school psychologist who did XXXXXX's evaluations that summer, testified that XXXXXX's reciprocal skills as related to his neurotypical peers were

> much more surface level. At this age, this is where we're going to see more of an impact if they do have deficits in this area. This is where we're going to see those impacts coming out. Kids are expected to, as they get older, as we get older developmentally, we're expected to understand other people's perspective, other people's stance on things. So I think that his deficits in those area are probably just coming to fruition now.
> . . .

---

[10] On August 30, 2019, Sharon Smith wrote to Rothenbuescher:

> Below is a letter that was sent to you on May 24th and you said that we can convene IEP meetings. We went through the entire process with meetings and testing and evaluations all summer long. On August 28th we had the final IEP meeting (which were only given two days notice)and [sic] it was determined that the county will not pay for [XXXXXX]'s private education. The school he is going to is a special education school. The Newton School is where is [sic] is going for the 6th grade. Why did you have us go through the process if we were not going to get paid by the county? Why didn't you tell [sic] just to move forward with due process? Why was the county's money and our time wasted this summer? Please respond and let us know your thoughts on all of this. Thank you.

AR 85-001. That same day, Jeffrey Smith wrote to Rothenbuescher:

> Heather,
>
> I am miffed as well why you made it appear you were willing to work with us and then delayed and disappeared from the process you put us through. The County had five years to help him – it was obvious we weren't going to let the County fail him again. But you didn't have to agree with us or lead us on, you could have just said to pursue a legal process. It's kind of insult on top of the injury my son has already received. I think some kind of answer here is deserved...this just seems like bad faith negotiation and it has real consequences on real peoples' time and lives.

Id.

Kids – again, it's a spectrum. So very often, children who are younger, if they have advanced verbal skills – and I read through, I know [XXXXXX], he developed all of his developmental milestones on time. His language skills were all on time. You are not necessarily going to see the impact of the social – the social piece until they are a little bit older and until those social demands change and become a little more complex.

AR 111-125–26. Additionally, an APS speech language pathologist conducted a speech and language evaluation of XXXXXX, which identified many language strengths and some weaknesses, and found that:

Analysis of formal and informal assessment measures indicates [XXXXXX]'s language skills are adequate for him to access his educational curriculum at this time. [His] deficits in social pragmatic language, specifically inferring what people might be thinking as well as generating appropriate solutions to conflict, may negatively impact his ability to negotiate conflicts with peers effectively and [sic] well as accurately interpret the body's language/visual cues generated by his peers. He may have difficulty maintaining friendships long term. [His] underdeveloped narrative skills may negatively impact his ability to generate cohesive and organized verbal information in order to explain concepts or provide information about social events.

AR 41-006. An eligibility evaluation was held for XXXXXX on August 7, 2019, where he was found eligible for special education support under the categories of specific learning disorder, autism, and other health impairment based on a diagnosis of ADHD, predominately inattentive type. AR 43. Zeller testified that specific learning disorder was found to be his primary disability, with other health impairment as secondary and autism as tertiary, and that the primary category is "the most impactful in the classroom, so that's where we're going to deliver most of our services." AR 111-127. Zeller also explained that the eligibility team does not make placement or goals and accommodation decisions; rather, the IEP team makes those decisions. AR 111-131–32.

On August 28, 2019, a team met to develop an annual IEP for XXXXXX for the 2019–2020 school year. The parents complain that they were only given two days warning, but they elected to go forward with the meeting even though Jeffrey Smith could not attend due to work

travel. AR 110-136. Sharon Smith also brought Reid, the St. Agnes vice principal, to the meeting.[11] The team proposed goals, accommodations, and services for XXXXXX, which included goals in all areas of academic and behavioral concern, including reading, written expression, handwriting, executive functioning, math, spelling, and social-emotional functioning. AR 45-011–14. Plaintiffs accurately state that all of the goals listed in the August 2019 IEP were exactly the same as the goals from the December 2017 IEP. AR 45; AR 73. It appears that only the "pre-score" dates were updated to "August 20, 2019," but the actual language of the goals was identical. Id. Plaintiffs particularly complain that there was only one goal related to pragmatic language development or social skills—"[XXXXXX] will participate appropriately with peers in group activities by following the rules of the activity and using materials as meant to be used with no more than 1 teacher prompt," which was recycled from the December 2017 IEP. AR 73-014. Plaintiffs also complain that this goal is not measurable.

As recommended in the reports, including the private evaluation done by Dr. Theis, accommodations such as frequent check-ins, prompts for attention, extended time on all tests and assignments, small group testing, read aloud, flexible schedule, access to flash pass, breakdown of multi-step tasks, scaffolding of assignments, and seating near the teacher or source of instruction were included in the IEP. AR 45-015. Plaintiffs complain that the proposed IEP failed to include a discussion of speech language development or pragmatic language services, but the lack of speech language services accords with the APS speech/language evaluation's conclusion

---

[11] Reid testified that she was not made to feel "welcome" by the APS members of the IEP team because nothing that she had sent ahead of time to be presented at the meeting was available; however, she was able to e-mail those documents to the team during the meeting, and no one told her she could not suggest changes or make other suggestions. AR 109-148–49. Additionally, Reid did offer input during a discussion about "the motivational factor" during the meeting. AR 109-150.

that "[XXXXXX]'s language skills are adequate for him to access his educational curriculum at this time." AR 41-006.

Under the August 2019 IEP, XXXXXX would have received all core academic instruction (English, math, science, and social studies), as well as an additional reading course, in team-taught classes. AR 45-016; AR 110-296. A team-taught class allows students with disabilities to participate in the regular education class and receive grade-level curriculum while at the same time being assisted by a certified special education teacher. AR 45-016; AR 110-296. Additionally, he would have received organizational instruction in a "self-contained" small group special education class. AR 45-016. For services, APS proposed 15 hours of specially designed instruction per week, with 11.5 hours in the general education team-taught classroom, as he had previously received at Nottingham, and 3.5 hours provided in a "self-contained" class. AR 45-015. Additionally, the IEP included 30 minutes of OT in the special education setting and 45 minutes in the general education setting per week. AR 45-015–16.

Following discussion of XXXXXX's needs, the team proposed Williamsburg, his neighborhood middle school located two miles from his house, as the placement for sixth grade. AR 45-019. At the conclusion of the meeting, Sharon Smith informed the team that XXXXXX would be attending Newton for the 2019–2020 school year, and that they had decided to enroll him as early as May 2019. AR 46; AR 110-091–92. She requested that the IEP team reconvene to further discuss his placement at Newton and gave her consent to permit APS to observe XXXXXX at Newton. The parents rejected the August 2019 IEP proposal.

Newton is a private school in Sterling, Virginia, which is in a different county than XXXXXX's home. The school serves about 100 students in kindergarten through eighth grade, most of whom do not have disabilities. AR 109-238, 240–41. Newton is not licensed by the

13

Virginia Board of Education as a school for placement of students with disabilities and does not

provide special education services. AR 54; AR 109-239–40. The teachers at Newton are not

required to carry any licenses or certifications, and the school does not administer the Virginia

SOLs. AR 109-244; AR 111-165–66. The class sizes are around eight students with two teachers

in kindergarten through fourth grade, and four to six students per class in the middle school.[12]

AR 109-207–08. The school has a student to teacher ratio of about four to one. Id.

In preparation for the scheduled October 7, 2019 meeting, APS conducted two

observations of XXXXXX at Newton. On September 17, 2019, Dr. Kelly Krug observed

XXXXXX during his current events and writing classes. AR 48; AR 111:159–60. She observed

that the class sizes were extremely small and that XXXXXX appeared engaged in class, although

the school did not use multisensory instruction, visual reminders, speech-to-text opportunities,

utilization of graphic organizers, chunking, or scaffolding of assignments as recommended in

plaintiffs' private evaluation of XXXXXX. AR 48; AR 111-162–64. On October 2, 2019, Sharon

Sterling, APS occupational therapy and physical therapy coordinator, conducted a second

observation at Newton. AR 49. She observed that during the reading class, XXXXXX required

more cueing and 1:1 assistance than his peers, showed little peer interaction, and appeared

disengaged, although he was more engaged and interacted with his peers when playing a

Jeopardy vocabulary game.[13] AR 49.

---

[12] The classes at Newton are roughly similar in size to the self-contained classes that XXXXXX would have been in at Williamsburg. AR 111-43–44.

[13] At the time of the hearing, XXXXXX had been attending Newton for more than half the school year. In response to the hearing officer's question about whether XXXXXX had made close friends at Newton, Jeffrey Smith testified:

> No, he hasn't. He's working on it though. He's got a couple of bright spots. To say to him, you know, we had this conversation, just make one friend. . . that's going to make the difference, you know, it's just – he just, I said, "[XXXXXX], like you just need one

The IEP team reconvened on October 7, 2019 with both parents present. AR 50-001. Given XXXXXX's needs in reading, writing, organization, and peer relations observed at Newton, and the parents' concerns that he required a smaller instructional setting, the team agreed that he could benefit from additional support via some "self-contained" small group classes. AR 111-167–68; AR 50-014–15. In discussing the structure of self-contained classes, the parents were given the opportunity to visit those classes at Williamsburg so they could experience that setting for themselves.[14] AR 111-168. Ultimately, the team proposed increasing XXXXXX's special education service hours from 15 to 17.5 hours per week to accommodate the addition of self-contained classes, as well as an increase in social emotional support in the general education setting.[15] AR 50-014–15; AR 111-026–27, 169. The parents did not agree to this IEP, and they filed a due process claim against APS on November 12, 2019.

## B.  Procedural Background

Following a three-day due process hearing on March 11, 12, and 13, 2020, the hearing officer issued a decision on April 20, 2020, finding that: (1) the two-year statute of limitations for IDEA claims barred all of plaintiff's claims accruing before November 11, 2017, including the 2015 and 2017 eligibility determinations; (2) plaintiffs were precluded from asserting claims regarding the 2017–2018 school year under IEPs with which they either expressly agreed, or did

---

friend, buddy." Like it's going to happen, you're going to get a friend. Don't worry." You know. And I think he, he's working on it. And they're really supporting him everywhere, like saying this is a kid that has – spend time with Jack or with this kid, rather. That wasn't what I heard when I went to the IEP meeting. That's not what Sharon heard.

AR 110-180–81.

[14] It does not appear from the record that they did so.

[15] Plaintiffs claim that they were unaware of the changed service hours and that they were not provided with a copy of the new proposed IEP. [Dkt. No. 26-1] ¶¶ 51–52. They did receive a Prior Written Notice ("PWN") in the mail for the October 2019 IEP meeting, but it did not specify in detail the changes made to the IEP. [Dkt. No. 26-1] ¶ 53.

not disagree; (3) APS provided XXXXXX with a Free Appropriate Public Education ("FAPE")

at all relevant times, including in its 2019–2020 IEPs and proposed placement at Williamsburg;

and (4) the parents' unilateral placement of XXXXXX at Newton was overly restrictive and not

educationally required. AR 168. Specifically, the hearing officer found that:

> Given that the Student would have been instructed and supported by certified education
> teachers for the entirety of his academic day, the programming that he would have
> received at Williamsburg is substantially more robust than that at his current placement
> and is altogether appropriate. Indeed, it is hard to conceive that the school division's IEP
> and placements don't provide enough special education, when even at St. Agnes, the
> Student passed all of his classes and was promoted to the next grade-which Rowley
> [holds] is a key indicator of appropriateness- without any special education at all. . . .
>
> Throughout the hearing, it became abundantly clear that the Parents' main concern with
> the Student was his social development. . . .
> . . .
> The Parents removed the Student from Nottingham because he had no friends there. They
> removed him from St. Agnes because he was bullied there and had not made friendships.
> They testified he had no friends at the Newton School. . . .
> . . .
> The Parents repeatedly explained the type of educational environment they were seeking
> for their son: "small class setting, individualized attention, and, probably most
> importantly of all, social skills, embedded into the curriculum." . . . What the Parents
> seek is exactly what [defendant] is offering. Additionally, the [defendant] has a very
> impressive anti-bullying program.

AR 168-005. As a result of these findings, the hearing officer concluded that APS was not

required to reimburse the plaintiffs for their tuition or costs of Newton School, but that plaintiffs

were "entitled to reasonable reimbursement for Dr. Theis' neuropsychological evaluation since a

lot of her recommendations were incorporated into the proposed IEP." Id.

Plaintiffs filed their complaint on July 7, 2020. [Dkt. No. 1]. In this lawsuit, plaintiffs

seek reimbursement for tuition and other expenses they incurred during the 2019–2020 school

year at Newton, and for tutoring and other expenses related to APS's alleged failure to provide

XXXXXX with a FAPE. They also seek reasonable attorneys' fees under the IDEA, and ask the

16

Court[16] to order APS to "[d]evelop an IEP containing appropriate Goals, Accommodations, [and] Services that incorporates the recommendations made by Dr. Theis" and "[d]evelop an IEP containing appropriate Placement, specifically The Newton School." [Dkt. No. 1] at 45. Although a briefing schedule was agreed to in the Joint Discovery Plan [Dkt. No. 9], only three briefs have been filed: APS's memorandum in support of its Motion for Judgment on the Administrative Record and Counterclaim [Dkt. No. 22] plaintiffs' memorandum in support of their Motion for Summary Judgment [Dkt. No. 26-1],[17] and APS's opposition memorandum [Dkt. No. 28]. The Joint Discovery Plan had dictated that any reply briefs would be filed on April 9, 2021, but no party has filed a reply brief.

## II. DISCUSSION

### A. <u>Standard of Review</u>

Although IDEA cases are original civil actions, they are adjudicated based upon the record of the administrative proceedings. Cty. Sch. Bd. of Henrico Cty. v. Z.P., 399 F.3d 298, 309 n.7 (4th Cir. 2005). Accordingly, judicial review "may be conducted on the administrative record even if there are disputed issues of material fact." Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996). The parties have agreed that this civil action should be decided

---

[16] Although the complaint filed in this court claims to seek relief from "the hearing officer," it appears that plaintiffs did not update their complaint from the administrative hearing and are instead seeking relief from this Court.

[17] At 45 pages in length, plaintiffs' memorandum exceeds this court's page limit and was filed without leave of court to exceed that limit, despite plaintiffs' agreement to the Joint Discovery Plan which stated that "[t]he page limits of Local Civil Rule 7(F) shall apply to all briefs." [Dkt. No. 9] at 4. Additionally, plaintiffs' memorandum has incorrect margins, as a line at the bottom of each page is cut off and completely invisible to the reader. Finally, plaintiffs' memorandum mainly appears to repeat their complaint, which itself repeated their closing argument memorandum in the administrative proceedings. In addition to these problems, plaintiffs' memorandum cited to the record before the hearing officer, rather than to the administrative record before the Court in this civil action. Despite these errors in plaintiffs' memorandum, the Court has given it full consideration.

based on the administrative record, as supplemented, and without the need for trial. See Rule 16(B) Scheduling Order [Dkt. No. 10] (approving Joint Discovery Plan [Dkt. No. 9]). Plaintiffs, as the party challenging the administrative decision, bear the burden of establishing that the decision was erroneous. Barnett v. Fairfax Cty. Sch. Bd., 927 F.2d 146, 152 (4th Cir.), cert. denied, 502 U.S. 859 (1991). To prevail, plaintiffs must show both that the special education program offered by APS was not appropriate for XXXXXX and that Netwon, the private school that plaintiffs unilaterally selected, was appropriate. Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).

In Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 998 (2017), the Supreme Court discussed and further explained the fundamental standard of appropriateness under the IDEA, first set out in its decision in Hendrick Hudson Central School District v. Rowley, 458 U.S. 176 (1982). In Endrew, the Court held that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew, 137 S. Ct. at 999. An IEP typically should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Id. This decision reaffirms a related principle in Rowley that an IEP must be "reasonable," but does not have to be "ideal." Id. (citing Rowley, 458 U.S. at 206-07). Additionally, the "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parents." A.B., 354 F.3d at 328; see also Endrew, 137 S. Ct. at 1001.

A district court reviewing a hearing officer's decision under the IDEA "conducts modified de novo review, giving due weight to the underlying administrative proceedings." O.S. v. Fairfax Cty. Sch. Bd., 804 F.3d 354, 360 (4th Cir. 2015) (internal quotations omitted).

"[A]dministrative findings in an IDEA case are entitled to <u>prima facie</u> correctness, and the district court, if it is not going to follow them is required to explain why it does not." <u>A.B. ex rel. D.B. v. Lawson</u>, 354 F.3d 315, 325 (4th Cir. 2004) (quoting <u>Doyle v. Arlington County Sch. Bd.</u>, 953 F.2d 100, 105 (4th Cir.1991)) (internal quotations omitted). "[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'" <u>Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P.</u>, 399 F.3d 298, 305 (4th Cir. 2005) (quoting <u>Doyle</u>, 953 F.2d at 105). "Factual findings are not 'regularly made' if they are reached through a <u>process</u> that is 'far from the accepted norm of a fact-finding process.'" <u>Id.</u> (quoting <u>Doyle</u>, 953 F.2d at 104) (emphasis added); <u>see also</u> <u>J.P. v. Cty. Sch. Bd. of Hanover</u>, 516 F.3d 254, 259 (4th Cir. 2008). In reviewing the administrative record, courts must give due regard to the hearing officer's findings because he had the opportunity to hear the testimony and assess the weight and credibility of the witnesses. <u>See</u> <u>Doyle</u>, 953 F.2d at 104-05; <u>A.B. ex rel. D.B. v. Lawson</u>, 354 F.3d 315, 327-28 (4th Cir. 2004); <u>Z.P.</u>, 399 F.3d at 306-07 ("We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under <u>Doyle</u> as explicit findings.").

## B. <u>Deference</u>

Plaintiffs argue that the hearing officer's decision is not entitled to any deference because the findings were not "regularly made." In the Fourth Circuit, administrative findings are regularly made if:

> the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.

<u>J.P.</u>, 516 F.3d at 260. Contrary to plaintiffs' argument, the record shows that the hearing officer allowed both parties to make opening statements, introduce evidence, and present and cross-

examine witnesses. See AR 109–111. The hearing officer frequently asked his own questions of witnesses to clarify issues and, following the hearing, allowed the parties to submit post-hearing briefs. The resulting decision is sufficiently detailed and makes findings that are dispositive of the issues in the case. In his decision, the hearing officer identified the correct central issues presented, AR 168-001; summarized witness testimony, AR 168-004–05; outlined the relevant legal standards, AR 168-004–05; and included findings of fact and legal conclusions, AR 168-002–03, 004–06.

Plaintiffs complain that the hearing officer "ignored the vast majority of the Parent's arguments and made little to no actual findings of fact regarding not only many of the Parent's concerns but some of the actual issues at stake in this matter. Of note, not one of Parent's procedural issues was even referenced in the hearing officer's decision." [Dkt. No. 26-1] ¶ 118. That the hearing officer gave greater weight to APS's witnesses was fully appropriate. See A.B., 354 F.3d at 328 ("IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parents."). The Fourth Circuit has held that "federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." Hartmann by Hartmann v. Loudoun Cty. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997). To the extent that the hearing officer's decision was not as fleshed out as plaintiffs might have wished and did not address every single procedural argument they made, this is not required by the Fourth Circuit. Rather, the Fourth Circuit has recognized that:

> It must be remembered that in Virginia, the IDEA hearing officers are lawyers appointed through the Supreme Court of Virginia to serve as judges in IDEA due process hearings. [citation omitted]. The hearing officers operate under tight time constraints—in non-expedited cases, a written opinion must be issued within 45 days after a request for a due

> process hearing is received. [citation omitted]. . . . [T]his short time-frame means that the
> written opinions may be issued before a transcript has been prepared. Under these
> circumstances, hearing officers (who have no state-provided law clerks or clerical
> support) cannot be expected to craft opinions with the level of detail and analysis we
> expect from a district judge. By rejecting the hearing officer's opinion in this case for
> lack of detail, the district court improperly held the hearing officer to a standard not
> dictated by statute or case law and one which ignored the constraints under which an
> IDEA hearing officer operates.

J.P., 516 F.3d at 263. Although the hearing officer's decision in this case was quite short, the

Fourth Circuit has held that "our case law has never suggested that any particular level of detail

is required in the hearing officer's decision. If anything, our case law suggests that the level of

detail required of a hearing officer is relatively low." Id. at 262. Accordingly, the hearing

officer's decision is entitled to a presumption of correctness.

### C.  Statute of Limitations and Agreed Eligibility Decisions and IEPs

Plaintiffs filed their due process complaint on November 11, 2019. AR 143. The hearing

officer correctly applied the IDEA's two-year statute of limitations to conclude that plaintiffs'

claims based on events before November 11, 2017 were time-barred, including any alleged

failure to properly identify XXXXXX under additional categories of eligibility in 2015 and

November 6, 2017, and denial of a FAPE in the February 13, 2017 IEP. AR 168-004, 06; see,

e.g., Torda v. Fairfax Cty. Sch. Bd., 2012 WL 2370631 (E.D. Va. 2012), aff'd 517 F. App'x. 162

(4th Cir. 2013) ("A two-year statute of limitations applies to the submission of this complaint,

requiring the violation alleged to have 'occurred not more than 2 years before the date the parent

or public agency knew or should have known about the alleged action that forms the basis of the

complaint[.]'") (citing 20 U.S.C. § 1415(b)(6)(B)). Plaintiffs were aware of the facts giving rise

to their would-be claims at the time of each eligibility or IEP meeting. Although plaintiffs spent

considerable time criticizing APS's eligibility determinations and IEPs from 2015 through 2017,

plaintiffs do not appear to challenge the hearing officer's application of the two-year statute of

limitations. See, e.g., AR 168-004 ("Contained within their closing briefs, both sides agree that any claim arising prior to November 11, 2017 are [sic] time barred.").

The hearing officer correctly found that "[t]he Parents are precluded from asserting claims as to the 2017-2018 school year under agreed IEPs, or portions of IEPs with which they did not disagree." Before August 2019, the parents signed all proposed IEPs in agreement (including those of March 9, 2015; February 23, 2016; February 13, 2017; and December 6, 2017), and agreed with all eligibility determinations (including those of February 2, 2015 and November 6, 2017). AR 9, AR 10, AR 13, AR 17, AR 23, AR 24, AR 43. It was not until after XXXXXX had been removed from APS for nearly a year and unilaterally placed at Newton that the parents expressed any concerns with his prior special education or eligibility. AR 85-003–5. Sharon Smith testified that she attended every eligibility and IEP meeting since March 2015. AR 110-061–62. Plaintiffs were repeatedly given the Virginia Department of Education Notice of Procedural Safeguards. AR 110-060, 69–70; AR 53. Every IEP, eligibility determination, and Prior Written Notice that APS provided to plaintiffs contained information as to the Procedural Safeguards and contact information for further assistance should they need help understanding any aspect of the special education process. See, e.g., AR 10, AR 13, AR 17, AR 23, AR 24, AR 25, AR 38, AR 43, AR 44, AR 45, AR 50, AR 51.

The Fourth Circuit has affirmed a district court's decision "declin[ing] to use . . . evidence to Monday-morning quarterback the school system," holding that "[j]udicial review [of evidence that arose only after the IEP was created] would simply not be fair to school districts, whose decisions would be judged in hindsight based on later assessments of a student's needs at [a] later point in time." Schaffer v. Weast, 554 F.3d 470, 475–77 (4th Cir. 2009) (internal quotations omitted); see also Fuhrman v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3rd

Cir. 1993) (whether a student was offered a FAPE is determined by looking at what was
reasonable at the time the IEP was offered to the student, not in hindsight). Based on that logic,
courts have held that parties are estopped from challenging prior agreed eligibility
determinations or IEPs for lacking certain goals or services where they did not promptly utilize
the administrative remedies for which they had notice. See Bd. of Educ. v. Brett Y., 155 F.3d
557 (4th Cir. 1998) (approving the district court's conclusion that the school system had not
denied a FAPE where everyone had agreed with the goals and objectives of the proposed IEP
and "neither the [parents] nor their counsel suggested that additional, specific goals needed to be
added" at the time of the IEP meeting); Ian H. v. Fairfax Cnty. Sch. Bd., No. 97-168-A, Slip. Op.
at *2 (E.D. Va. 1997) ("[P]laintiff's failure to pursue her administrative remedies promptly
denied defendants any opportunity to address the objections which she now makes before private
school tuition costs had been incurred. Plaintiff is therefore estopped from challenging the May
1994 eligibility decision and seeking reimbursement of such tuition costs."); Vipperman v.
Hanover Cnty. Sch. Bd., 22 IDELR 796, 799-801 (E.D. Va. 1995) (holding that where parents
received notice of their right to pursue administrative remedies and did not do so, they could not
raise procedural challenges to the prior IDEA procedures).[18]

Plaintiffs acknowledge that they did not request updated evaluations at the December 6,
2017 IEP meeting. Although plaintiffs rely on Harris v. D.C., to emphasize that "continual

---

[18] Defendant cites to Stimpson v. Plano Independent School District for its holding that "parents
[are] estopped from alleging, years later, that previously agreed-to IEPs were inappropriate,"
[Dkt. No. 22] at 23; however, that case concerned a former teacher alleging intentional
interference with contract against the school district and school superintendent. 743 S.W.2d 944,
946 (Tex. App. Dallas 1987), writ denied, (May 11, 1988). Although the case discusses whether
the teacher was estopped from asserting a claim of intentional interference with a contract
because she voluntarily resigned her employment, it is otherwise irrelevant and does not stand
for the proposition for which defendant cites it.

evaluations [a]re necessary, and parents must have the ability to seek redress for a school's failure to sufficiently monitor a child's progress under the IEP," Harris concerned a parent's filing a due process complaint based on the school district's failure to fund an independent functional behavioral assessment after she requested that it do so. 561 F. Supp. 2d 63, 68 (D.D.C. 2008). That is the opposite of this case, in which the plaintiffs did not challenge the decision not to re-test XXXXXX when that decision was made. Accordingly, the hearing officer's conclusion that "parents who fail promptly to utilize administrative remedies are estopped to argue the incorrectness of decisions which they could have prevented by asserting them earlier" is correct, and plaintiffs may not now challenge the December 6, 2017 IEP. AR 168-004.

### D. 2017 Eligibility Determination and IEP

Even if plaintiffs were not time-barred from challenging the agreed November 6, 2017 eligibility determination and estopped from challenging the agreed December 6, 2017 IEP, these determinations did not violate XXXXXX's access to a FAPE.

A reevaluation need only be conducted if (1) the district "determines that the educational or related services needs . . . of the child warrant a reevaluation," or (2) if the student's parent or teacher requests one. 34 C.F.R. §300.303(a). Additionally, the IDEA expressly permits districts to forego new formal assessments where the district and parents agree that new assessments are not necessary. 34 C.F.R. §300.303(2)(b)(2). At the November 6, 2017 eligibility determination meeting, the parents and APS staff agreed that based upon the substantial information already available regarding XXXXXX's academic and social-emotional strengths and weaknesses, no additional evaluations were required to make an eligibility decision, and he was found to remain eligible to continue receiving services under the category of specific learning disorder. AR 23; AR 110-254–55. Defendant's witnesses testified that XXXXXX's behavior at that time indicated that his current classification remained appropriate without the need for further testing. Although

24

XXXXXX was later found eligible in 2019 under categories of autism and other health impairment based on a diagnosis of ADHD, predominately inattentive type, specific learning disorder was still his primary disability, which Zeller testified is "the most impactful in the classroom, so that's where we're going to deliver most of our services." AR 111-127. Plaintiffs' reliance on Phyllene W. Huntsville County Board of Education is misplaced. 630 F. App'x 917 (11th Cir. 2015) (unpublished). In Phyllene, the school district's knowledge of the student's significant hearing loss and the parent seeking medical treatment for that loss put the district on notice that the student might have a hearing impairment. Id. Here, in contrast, APS had no information, either from XXXXXX's teachers, his parents, or another third-party evaluator, that there were significant concerns regarding his social or executive functioning skills to put the district fairly on notice of additional areas of disability. Moreover, a student's IEP, not his eligibility classification, determines services and programming. AR 110-256; Heather S. v. State of Wisconsin, 125 F.3d 1045, 1055 (7th Cir. 1997) ("[W]hether Heather was described as cognitively disabled, other health impaired, or learning disabled is all beside the point. The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education."); Lauren C. v. Lewisville Indep. Sch. Dist., 904 F.3d 363, 377 (5th Cir. 2018) (same); E.M. v. Pajaro Valley Unified Sch. Dist., 758 F.3d. 1162, 1173 (9th Cir. 2014) (focus should not be on the classification, but on "determining the child's actual educational needs"). Accordingly, any alleged failures to re-test XXXXXX did not deny him a FAPE.

Similarly, the December 6, 2017 IEP was "reasonably calculated to enable [XXXXXX] to make progress appropriate in light of [his] circumstances." Endrew, 137 S. Ct. at 999. The IEP contained multiple goals and accommodations that were the result of collaboration between the parents and APS staff, and included significant support by Garrett, his special education teacher

25

for first, third, and fourth grades. AR 111-204. XXXXXX received 14.5 hours per week of special education support for the first four months of the school year, and then 17 hours per week from December 2017 onward. AR 17; AR 24. That year, XXXXXX made progress by increasing his Developmental Reading Assessment score; passing SOLs in reading, math, and Virginia Studies; maintaining mostly B grades; and interacting appropriately with peers, which is further evidence of the appropriateness of the IEP. AR 30-004; AR 43; AR 45-006; AR 110-198–200, 210–11.

### E.  2019–2020 IEP

The hearing officer correctly found that APS offered XXXXXX a FAPE for the 2019–2020 school year. The August 28, 2019 IEP proposed that XXXXXX receive similar services to those he previously received while attending Nottingham, which had enabled him to make educational and social progress. AR 45. In the August 28, 2019 IEP, APS proposed 11.5 hours of specially designed team-taught instruction and 3.5 hours of explicit instruction in organization and social skills in the self-contained setting for a total of 15 hours, as well as 30 minutes of OT in special education and 45 minutes of OT in general education settings. AR 45-015. Based on APS's August 2, 2019 speech and language evaluation, which found that "[the Student]'s [overall] language skills are adequate for him to access his educational curriculum," it was appropriate for APS staff to determine that XXXXXX's pragmatic language skills could be addressed via the proposed social-emotional goal, and that he did not require speech therapy. AR 41-006. Although the goals in this IEP were mostly identical to the ones proposed in the December 2017 IEP, APS had not had XXXXXX as a student for a year, and it was reasonable after reviewing the new testing done both privately and by APS for APS to conclude that the same goals were appropriate. Plaintiffs claim that APS failed to review and consider their report from private testing done by Dr. Theis, but both of the 2019 IEPs summarize her results, AR 45-

003–05 and AR 50-002–04, and, as the hearing officer correctly found, the IEPs explicitly incorporated many of her recommendations including instruction in a classroom with a small student-to-teacher ratio, environmental structure, multi-modal instruction, and frequent reinforcement.[19] AR 168-004–06; AR 109-40; AR 45; AR 43.

In the October 7, 2019 IEP, based upon information gathered during APS's two classroom observations at Newton, APS proposed an increase in service hours to 17.5 hours per week. Compare AR 45-015, with AR 50-014. This increase reflected 10.25 hours of small group special education in reading, English, and instructional studies addressing executive functioning and social skills, and 7.25 hours of team-taught instruction in science, social studies, and math, which would provide XXXXXX with special education support in all academic courses. AR 50. The IEP included many accommodations, as well as OT in the special education and general education settings. AR 50. Although plaintiffs proffered witnesses who testified for the first time at the hearing about their criticisms of the IEP, defendant correctly argues that none of those opinions had ever been shared with the IEP team during the IEP process, when those concerns could have been addressed and incorporated into the IEP if appropriate. AR 109-148–50, 293–95, 300.

The IEP would have been implemented at Williamsburg, XXXXXX's neighborhood school, which would be the least restrictive environment for XXXXXX. AR 50. In addition to requiring that disabled students receive a FAPE, the IDEA also requires that any FAPE be in the

---

[19] Contained in the record are plaintiffs' recordings of school meetings on June 17, 2019; August 7, 2019; August 28, 2019; and October 7, 2019. AR 91. Although plaintiffs argue that at no point during the August 28, 2019 or October 7, 2019 meeting did the team discuss Dr. Theis' private evaluation of XXXXXX, plaintiffs have provided no transcripts or citations for the almost six and a half hours of audio they have provided. Because the team clearly included the results of Dr. Theis' evaluation and incorporated many of her recommendations in the IEP, it was not necessary for the Court to listen to hours of these recorded meetings.

"least restrictive environment." Rowley, 458 U.S. at 202. The least restrictive environment is not just a "laudable goal, but also a requirement of the Act." DeVries v. Fairfax Cty. Sch. Bd., 882 F.2d 876, 878 (4th Cir. 1989); see also Doyle v. Arlington Cty. Sch. Bd., 806 F. Supp. 1253, 1260 (E.D. Va. 1992), aff'd, 39 F.3d 1176 (4th Cir. 1994) (reversing hearing officer who "misunderstood the mandatory nature of the least restrictive environment provisions"). Applicable regulations provide that local placements are highly preferred, and school systems should turn to private placements only when the student's disability is such that he or she cannot be educated in a public-school setting. 34 C.F.R. §300.550(2). Moreover, a school system must ensure that the student's placement is "as close as possible to the child's home." 34 C.F.R. § 300.552(b)(3). Williamsburg is clearly the least restrictive environment, as Newton is a private school located in Loudoun County, and Williamsburg is XXXXXX's neighborhood school, which includes students with disabilities and nondisabled students.

Plaintiffs argue that XXXXXX requires both small class sizes and classes that are not solely made up of "lower functioning peers," and that therefore there is no appropriate placement for him within APS because the "self-contained" small classes are with other special needs students, while the general education classes are too large. [Dkt. No. 26] ¶ 104. Although the environment sought by the parents might be ideal for XXXXXX, that is not what the IDEA requires. An IEP must be "reasonable," but does not have to be "ideal." Endrew, 137 S. Ct. at 999 (citing Rowley, 458 U.S. at 206-07). Plaintiffs have not shown that APS's proposed placement for XXXXXX is unreasonable, and they are not entitled to the most "ideal" environment under the IDEA.

Additionally, Newton is not accredited for special education placement. As the hearing officer found:

28

> Both sides presented convincing evidence that the Student requires the assistance of specially trained special education teachers. Yet, the Parents are asking that their son be enrolled in the Newton School at [APS's] expense, a school with no special education teachers, no IEP and no success in tackling the Student's social development problems. This inconsistent position is unacceptable.

AR 168-005. Accordingly, the hearing officer correctly found that APS's proposed IEPs for the 2019–2020 school year were appropriate and would enable XXXXXX to receive a FAPE in the least restrictive environment.

Plaintiffs also complain that they did not receive a copy of the October 7, 2019 IEP at the end of the meeting and were therefore unaware of the changes made to the proposed IEP at the meeting. A hearing officer may find that the student was denied a FAPE for procedural inadequacies only if the procedural inadequacies: (1) impeded the student's right to a FAPE, (2) significantly impeded the parents' opportunity to participate in the decision-making process, or (3) deprived the student of a FAPE. 34 C.F.R. § 300.513; 8VAC20-81-210(O)(17). "The Fourth Circuit and other courts have equally recognized that mere technical violations of . . . procedures, which do not deny meaningful parental participation, do not render a school system's proposed program inappropriate." Doyle v. Arlington Cty. Sch. Bd., 806 F. Supp. 1253, 1260 (E.D. Va. 1992), aff'd, 39 F.3d 1176 (4th Cir. 1994). In Doyle, the court disagreed with a similar argument regarding notice because:

> The parents had extensive actual notice of all the things required by that section of the regulations. Mairin's mother testified at trial that she clearly knew the placement was Nottingham at the time. The parents here have participated fully in the assessment, eligibility, and IEP process, and have been advised by counsel throughout. There can therefore be no violation of the [Education of the Handicapped Act].

> Indeed, the same type of "lack of notice" argument embraced by the local hearing officer was condemned by another District Court in Brookline School Committee v. Golden, 628 F.Supp. 113, 115 n. 1 (D.Mass.1986). The Court there noted that "the fact of actual knowledge casts a shadow over the parents' motives for pressing the issue of Brookline's compliance with the statutory notice requirements at the Bureau hearing." Likewise here,

the alleged lack of further written notice to the parents of the Nottingham placement proposal is practically and legally irrelevant.

Id. Here, the parents were active participants at both the August 28, 2019 and October 7, 2019 IEP meetings. After Sharon Smith participated in the August 28, 2019 IEP discussions, plaintiffs received a copy of the proposed August 2019 IEP and a mailed Prior Written Notice dated September 3, 2019. AR 45; AR 26. Both parents participated in the October 7, 2019 IEP meeting, at which they rejected the IEP proposal that would have increased the "self-contained" small group classes for XXXXXX to include reading and English in addition to instructional studies and increased social emotional support within the general education setting. Following this meeting, plaintiffs received a mailed Prior Written Notice[20] dated October 8, 2019, which referenced the October 7, 2019 IEP and stated that:

> The team updated the proposed IEP based on the recent observations at the Newton School. The team reached consensus that [XXXXXX] required additional support and could benefit in a low staff to student ratio, which is available at WMS. APS staff offered the Parents the opportunity to observe small group, self-contained instruction at WMS.

> The IEP reached consensus to increase services in self-contained academics on the proposed APS IEP to assist [XXXXXX] with focus, attention, and to limit distractions. The team also reached consensus for accommodations to support [XXXXXX]'s writing, legibility and ability to get his ideas on paper without having to write (e.g., voice to text). At the conclusion of the meeting, both parents verbally rejected the proposed APS IEP.

AR 51-002. Accordingly, plaintiffs had notice of the proposed changes to the IEP based on their participation in the October 7, 2019 IEP meeting and receipt of the Prior Written Notice. Additionally, plaintiffs identify no specific material evidence that any procedural defect in notice of the October 7, 2019 IEP interfered with the provision of a FAPE for XXXXXX or their participation in the IEP development process.

---

[20] Although titled "Prior Written Notice," the purpose of the document is to "summarize the [IEP] meeting" in terms of "[w]hat was offered, what was rejected." AR 111-097–98.

**F.  Reimbursement for Private Evaluation**

Defendant seeks a reversal of the hearing officer's decision that "[t]he Parents are entitled to reasonable reimbursement for Dr. Theis' neuropsychological evaluation since a lot of her recommendations were incorporated into the proposed IEP." AR 168-006.

Defendant argues that plaintiffs did not request reimbursement for this evaluation in their due process complaint, did not put on any evidence as to its cost during the administrative hearing, and did not argue for reimbursement in their closing argument before the hearing officer. As a result, this issue was not addressed by defendant at the hearing. Defendant also argues that because the claim was not raised or exhausted during the administrative process, it cannot properly be recovered. Doe v. Arlington Cnty. Sch. Bd., 41 F. Supp. 2d 599, 607-08 (E.D. Va. 1999) (holding that parties must first exhaust all administrative procedures under the IDEA); Jenkins v. Bay House Associate, L.P., 266 Va. 39, 43-44 (2003) ("[A] court is not permitted to enter a decree or judgment order based on facts not alleged or on a right not pleaded and claimed.").

A school district is not obligated to reimburse a parent for a private evaluation obtained at the parent's own expense simply because the district considers such report and incorporates its recommendations into the student's special education programming. The applicable regulations require only that if a parent "shares . . . an evaluation obtained at private expense, the results of the evaluation must be considered by the public agency." 34 C.F.R. § 300.502(c). The proper procedure for obtaining an independent educational evaluation at public expense requires the parents to request one from the public agency. 34 C.F.R. § 300.502. If their request is denied, the parents can still obtain an independent evaluation at their own expense. Id. Plaintiffs have not made any arguments regarding this award or even addressed it in their complaint or memorandum for summary judgment. Given how little this issue has been addressed by the

parties, the uncontradicted evidence that APS conducted its own evaluations of XXXXXX after reviewing plaintiffs' private evaluation, and that plaintiffs did not follow the proper procedure in first requesting that defendant pay for an independent educational evaluation, plaintiffs are not entitled to reimbursement for the independent evaluation. Accordingly, the hearing officer's decision in regards to plaintiffs being reimbursed for XXXXXX's private evaluation will be reversed, and defendant will not be required to pay the costs of the private evaluation.

III. CONCLUSION

For all these reasons, defendant's Motion for Judgment on the Administrative Record [Dkt. No. 21] will be GRANTED, plaintiffs' Motion for Summary Judgment on the Administrative Record [Dkt. No. 26] will be DENIED, the hearing officer's decision will be affirmed in all respects except for the grant of reasonable reimbursement for Dr. Theis's neuropsychological evaluation, and judgment will be entered in defendant's favor by an Order to be issued with this Memorandum Opinion.

Entered this 7ᵗʰ day of June, 2021.

Alexandria, Virginia

/s/<br>Leonie M. Brinkema<br>United States District Judge